Gustavo Ponce, Esq.
Nevada Bar No. 15084
Mona Amini, Esq.
Nevada Bar No. 15381
**KAZEROUNI LAW GROUP, APC**
6069 South Fort Apache Road, Suite 100
Las Vegas, Nevada 89148
Telephone: (800) 400-6808
Facsimile: (800) 520-5523
E-mail: gustavo@kazlg.com
E-mail: mona@kazlg.com

Andrew J. Shamis, Esq. *(pro hac vice forthcoming)*
Florida Bar No. 101754
**SHAMIS & GENTILE, P.A.**
14 NE 1st Avenue, Suite 705
Miami, Florida 33132
Telephone: 305-479-2299
ashamis@shamisgentile.com

Scott Edelsberg, Esq. *(pro hac vice forthcoming)*
Florida Bar No. 0100537
Christopher Gold, Esq. *(pro hac vice forthcoming)*
Florida Bar No. 088733
**EDELSBERG LAW, P.A.**
20900 NE 30th Ave., Suite 417
Aventura, FL 33180
Telephone: (786) 289-9471
Facsimile: (786) 623-0915
scott@edelsberglaw.com
chris@edelsberglaw.com

*Attorneys for Plaintiff and the Putative Class*

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| GARY YAGHYAZARIAN, individually and on behalf of all others similarly situated , | Case No.: |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| vs. | |
| PROGRESSIVE DIRECT INSURANCE COMPANY, an Ohio corporation, | **JURY TRIAL DEMANDED** |
| Defendant. | |

CLASS ACTION COMPLAINT

Plaintiff Gary Yaghyazarian ("Plaintiff"), by and through undersigned counsel, brings this class action, individually and on behalf of all others similarly situated, against Progressive Direct Insurance Company ("Progressive" or "Defendant") and alleges as follows:

## INTRODUCTION

1.      This is a class action on behalf of Plaintiff and all other similarly situated claimants in Nevada who received a payment for the loss of a totaled vehicle from Defendant, where Defendant used valuation reports prepared by Mitchell International, Inc. ("Mitchell") to determine the actual cash value ("ACV") of the loss vehicles.  Through Mitchell's valuation, Defendant systemically thumbs the scale when calculating the ACV of claimants' loss vehicles by applying so-called "Projected Sold Adjustments" that are: (a) arbitrary; (b) contrary to appraisal standards and methodologies; (c) not based in fact, as they are contrary to the used car industry's market pricing and inventory management practices; (d) not applied by the major competitor of Defendant's vendor Mitchell; and (e) on information and belief, not applied by Defendant and Mitchell to insureds in other states like California and Washington.

2.      In the event of a "total loss" to an insured vehicle—*i.e.*, where repair of the vehicle is impossible or uneconomical—Defendant's uniform insurance policies with Plaintiff and all putative Class members (defined below) promises to pay for the loss, limited to the ACV of the vehicle. Attached as Exhibit A is a copy of Plaintiff's Policy ("Policy"), which is materially identical to the policy for all members of the putative Class.

3.      When valuing total loss claims for vehicles, it is improper for an automobile insurance company, such as Progressive, to undervalue and underpay the claims by manipulating the data used to determine the ACV of the vehicles. Specifically, under their insurance policy terms and applicable Nevada law, Defendant has a duty to pay, and represent that it will pay, the ACV of a loss vehicle

CLASS ACTION COMPLAINT

when adjusting total loss claims.

4.    Notwithstanding these obligations and representations, Defendant fails to fulfill this obligation by taking advantage of a valuation process that employs improper and unreasonable adjustments to reduce the value of comparable vehicles specified in the valuation reports, which in turn reduces the valuation of the total loss vehicles and the corresponding claim payment

5.    Specifically, Defendant, through Mitchell, systemically applies a so-called "Projected Sold Adjustment" that results in a significant downward adjustment to the base values of the comparable vehicles used to calculate the ACV of Plaintiff's and Class members' total loss vehicles. This reduction is contrary to appraisal standards and methodologies and is not based in fact, as it is contrary to the used car industry's market pricing and inventory management practices. The adjustment is applied to each of the comparable vehicles on top of adjustments for differences such as mileage, options, and equipment. The only purported explanation for the downward adjustment appears on the last page of the valuation reports and is a general, nondescript statement claiming that the reduction is to "reflect consumer purchasing behavior (negotiating a different price than the listed price)." Exhibit B at p. 7.

6.    Neither Progressive nor Mitchell has ever conducted any study or research to determine whether such "consumer purchasing behavior" exists and impacts ACV in the modern used-car market. Worse than this complete lack of curiosity is that Defendant thumbs the scale by discarding vast amounts of relevant data that contradict applying a Projected Sold Adjustment. For example, until July 2021, Defendant, through its vendors, simply threw out all data where the list price equaled or exceeded the sold price. And to this day, it persists in excluding from Projected Sold calculations some data where the list price equaled sold price and all data where the sold price exceeds the list price, even though examples abound of dealerships that charge more than advertised price to customers purchasing a vehicle

CLASS ACTION COMPLAINT

with cash—i.e. not providing the dealer the opportunity to profit through financing the sale or acquiring a trade-in—which is particularly relevant to the inquiry of determining a vehicle's ACV. Defendant fails to control for whether the vehicle was purchased with cash, or whether there were ancillary purchases or transactions that may influence the "sales price" but not the ACV (e.g., whether the customer traded in a vehicle at time of purchase, bought an extended warranty or service plan, or financed the purchase).

7.      Nevertheless, Progressive applies a Projected Sold Adjustment to the advertised (or listed) price of comparable vehicles when calculating the ACV of total-loss vehicles. For Plaintiff, the Projected Sold Adjustment was approximately 1.7% of each of the two comparable vehicle's value prior to adjustments. To arrive at the Projected Sold Adjustment amount, however, Progressive, through third-party vendors, and as set forth above, categorically excludes transactions that undermine its flawed thesis: for example, transactions where the sold price exceeds list price, transactions from dealerships who market themselves as "no-haggle" dealerships, and every transaction where the sold price equaled the advertised price.

8.      As explained herein, the used auto market is such that, given the ubiquity of Internet advertising and shopping and developments in sophisticated pricing software, car dealerships simply do not negotiate off of Internet-advertised prices. Any difference between a list and sales price does not reflect a negotiation of the vehicle's cash value, but rather that a dealer shifted its profits to other components of the transaction: for example, profits made through financing or trade-in or ancillary products described above, or that the dealer applied a generally unavailable discount to the cash value of the vehicle (such as employee discount, loyalty discount, military discount, or friends/family discount). But Progressive ignores these market realities and is content with paying insureds and claimants below-market prices for their totaled vehicles.

9.      To arrive at its conclusion that consumers negotiate down the

CLASS ACTION COMPLAINT

advertised price, Progressive, through its vendors, intentionally distorts the data, excludes transactions that undercut its false hypothesis, and ignores market realities, all for the purpose of applying a capricious and unjustified Projected Sold Adjustment to artificially deflate the value of total loss vehicles.

10.    This pattern and practice of undervaluing comparable and total loss vehicles when paying automobile total loss claims through arbitrary, unsupported, and unjustified adjustments, which benefits the insurer at the expense of the insured, violates Defendant's policies with its insureds.

## PARTIES

11.    Plaintiff Gary Yaghyazarian, at all relevant times, is and was a Nevada citizen. At all relevant times, Plaintiff was contracted with Progressive for automobile insurance. On or about October 17, 2021, Plaintiff was in a car wreck and Defendant deemed his vehicle to be a total loss.

12.    Defendant Progressive Direct Insurance Company is an Ohio company with its principal place of business in Ohio. Defendant is a subsidiary of Progressive Group entities. Defendant provides insurance coverage throughout the United States for first-party property damage under collision and/or comprehensive coverage. At all relevant times, Defendant conducted business in Nevada through insurance agents and other company personnel.

## JURISDICTION AND VENUE

13.    Minimal diversity exists under the Class Action Fairness Act ("CAFA"), 28 U.S.C. §§ 1332(d), 1441(a)-(b), and 1453. Plaintiff and the proposed class members are citizens of the State of Nevada. Defendant is an Ohio Corporation that has its corporate headquarters in Ohio, and, at all relevant times hereto, Defendant was engaged in the business of marketing and selling insurance policies and adjusting insurance claims in the State of Nevada.

14.    Plaintiff estimates that there are more than 100 putative class members, and the aggregate compensatory damages (in the amount of the Projected Sold

KAZEROUNI
LAW GROUP, APC

Adjustment that were deceptively deducted), claimed by Plaintiff and the Class are estimated in good faith to exceed $5,000,000.00.

15.     Venue is proper in this District under 28 U.S.C. § 1391, as a substantial portion of the conduct giving rise to Plaintiff's claims occurred in this District, and Defendant transacts business in this District.

## FACTUAL ALLEGATIONS

### Defendant's Systemic Application of Projected Sold Adjustments

16.     On October 17, 2021, Plaintiff was involved in a car wreck and sustained physical damage to his vehicle. At the time of the car wreck, Plaintiff was contracted with Progressive.

17.     Like all members of the putative Class, Plaintiff made a property damage claim to Defendant.

18.     Pursuant to uniform policies and procedures, Defendant declared Plaintiff's vehicle to be a total loss and purported to pay him the ACV of his loss vehicle, as Defendant promised and represented it would under the uniform provisions of its insurance policies and Nevada law.

19.     When calculating its valuations and claims payments, Defendant systemically employs a routine "total loss settlement process." This process involves obtaining a "Vehicle Valuation Report" from Mitchell and relying upon the valuation provided by Mitchell as the ACV amount owed under the policy. Defendant provided a Mitchell Vehicle Valuation Report for Plaintiff on December 21, 2021. *See* Exhibit B.

20.     The Mitchell Vehicle Valuation Reports used by Defendant during the relevant period followed the same process, provided and disclosed the same or substantially the same material information, and presented that material information in the same or substantially the same format. These valuation reports purport to contain values for comparable vehicles for sale in the claimant's geographic area. The reports also contain a purported valuation of the loss vehicle based upon these prices

CLASS ACTION COMPLAINT

for comparable vehicles listed in the report. The report then adjusts the advertised prices of those comparable vehicles to account for differences in equipment, mileage, and vehicle configuration. Exhibit B at p. 7.

21.     In addition, however, the valuation reports used by Defendant make a further adjustment to each loss vehicle called a "Projected Sold Adjustment." For Plaintiff, Projected Sold Adjustments in the amounts of -$835.00, and - $794.00 respectively, were applied to each of the two comparable vehicles. Exhibit B at p. 6.

22.     Defendant provides no data specific to the comparable vehicles or any explanation of industry practices in its valuation reports to support *any* Projected Sold Adjustment, much less the specific downward adjustments used in Plaintiff's valuation report. Instead, the *only* explanation is buried on the last page of each report, stating in full: "Projected Sold Adjustment – an adjustment to reflect consumer purchasing behavior (negotiating a different price than the listed price)." Exhibit B at p. 7.

23.     In truth, Defendant's Projected Sold Adjustments do not reflect market realities (the context in which "consumer behavior" occurs) and run contrary to customary automobile dealer practices and inventory management, where list prices are priced to market to reflect the intense competition in the context of Internet pricing and comparison shopping. Before the ubiquity of online advertising and shopping, "advertised" prices had very little to do with eliciting car buyers to particular dealerships—instead, car buyers generally went to their local used car dealership that had the desired vehicle in stock for sale. The "advertised" price was simply whatever price was listed on the physical window. And consumers could not, as they can now, easily compare that price to Internet advertisements of the same vehicle offered by competitors.

24.     As such, dealerships generally priced vehicles above market knowing that some consumers might be poor negotiators and they would realize an inflated profit on those sales. This above-market "window" price obviously allowed for

CLASS ACTION COMPLAINT

1    negotiation, and a downward negotiation would often occur.

2         25.    But during the Class Period, that is simply no longer how the used car

3    market operates. Now, given the need for Internet advertising, the prevalence of

4    Internet shopping and consumer behavior, developments in sophisticated pricing

5    software universally used by car dealerships, and the ease with which consumers can

6    compare the advertised prices of identical vehicles across multiple competing

7    dealerships, used car dealerships no longer price vehicles above market with room

8    for—and the expectation of—negotiation. Instead, car dealerships use sophisticated

9    pricing software—which provides the advertised prices of all competitors; the

10    average "turn" of a given year, make and model; the amount for which vehicles have

11    sold during a given time-period; etc.—and now appraise vehicles before acquiring

12    them to price them to market and do not negotiate from that price.

13         26.    This makes sense, because if a car dealership priced a vehicle above

14    market with room for negotiation, consumers would simply not go to that dealership.

15    This is because consumers can easily compare advertised prices and would seek out

16    the vehicle priced to market, rather than the same vehicle priced at a higher amount

17    (i.e., above market). Given the choice between paying less or paying more for an

18    identical vehicle, consumers will choose to pay less.

19         27.    As such, a negotiated discount off the cash price is highly atypical and is

20    not proper to include in determining ACV. The inclusion of this significant

21    downward adjustment purportedly to "reflect consumer purchasing behavior" is

22    particularly improper in the context of this action—insureds who have suffered a total

23    loss of their vehicle and need to procure a replacement have limited time to search

24    out the illusory opportunity to obtain the below-market deal Defendant assumes

25    always exists without any explanation or support.

26         28.    Defendant's Projected Sold Adjustments are contrary to appraisal

27    standards. There are multiple generally-recognized and acceptable methodologies for

28    determining ACV, including use of comparable vehicles. Defendant begins the

process of valuing loss vehicles using comparative methodology but improperly deviates from that process by thumbing the scales against the insured. Defendant documents the loss vehicle's and each comparable vehicle's mileage, options, and trim, which are compared in the report, and makes dollar adjustments accordingly. Plaintiff does not challenge these documented adjustments. At this stage of the process, however, Defendant abandons the comparative methodology and applies adjustments that are contrary to proper appraisal methodologies for determining ACV. Appraisers use advertised prices and make adjustments based only on observed and verifiable data; appraisal standards do not permit arbitrary adjustments from the advertised price based upon undocumented and unverifiable projections.

29.     Defendant thumbs the scale by discarding vast amounts of relevant data that contradict any application of a Projected Sold Adjustment and by failing to control for material variables, including whether there were ancillary purchases or transactions that may influence what is recorded as the "sales price" but do not influence the ACV (e.g., whether the customer traded in a vehicle at the time of purchase, bought an extended warranty or service plan, or financed the purchase).

30.     Until July 2021, Defendant excluded from the calculation of the Projected Sold Adjustment all transactions in which the list price of a vehicle equaled the sold price.

31.     Even after July 2021, Defendant still excludes some transactions in which the list price of a vehicle equals the sold price.

32.     Defendant has excluded and continues to exclude from the calculation of the Projected Sold Adjustment all transactions in which the sold price of a vehicle is greater than the list price.

33.     Without having performed any investigation or study, Defendant simply assumes all such transactions are anomalies.

34.     Likewise, Defendant has not exercised even a modicum of curiosity to investigate whether market realities support the application of a Projected Sold

CLASS ACTION COMPLAINT

Adjustment. Nor does Defendant or its vendors attempt to verify—even a single time—for those transactions where the advertised price exceeded sold price, whether the reason for the reduction was negotiation of the cash price of the vehicle and not some other (far more likely) reason, some of which are discussed herein.

35.    Neither Progressive's form Policy nor Nevada law permit reducing a vehicle's value for invented or arbitrarily assumed justifications.

36.    Moreover, the accuracy of Defendant's data is, at best, suspect, as it contains a significant number of transactions where the advertised date in the database comes after the sold date. As a matter of simply chronology, it makes no sense to advertise a vehicle after it is sold. But here, too, Defendant makes no effort to control for this obvious flaw in the data.

37.    These irremediable, and unjustifiable, errors, of course, skew the data in favor of Defendant to the detriment of the insureds.

38.    Moreover, examples abound demonstrating the glaring error of Defendant's cherry-picking practices.

39.    For example, related to the exclusion of sales prices greater than list prices, all advertised prices for comparable vehicles listed in Defendant's valuation reports are scraped from Internet sources—specifically Cars.com, Autotrader.com, Vast.com, and TrueCar.com.

40.    The advertised prices many dealerships publish on these websites include discounts for consumers who are financing and providing a trade-in. Thus, a consumer who was not financing the vehicle through the dealership or who was not trading in a vehicle—obviously, insureds who sustained a total loss almost certainly are not trading a vehicle when purchasing a replacement vehicle—would have to pay in cash more than the price listed on sources where Mitchell scrapes advertisements for comparable vehicles. In determining the ACV of Plaintiff's and class members' totaled vehicles, there is no justification for Defendant to have excluded those transactions from calculating the Projected Sold Adjustment, while only including

CLASS ACTION COMPLAINT

transactions where the sold price was recorded as less than the list price.

41. Simply put, there is no justification for Progressive to exclude such transactions as outliers or mistakes when justifying how it calculates the amount of the so-called Projected Sold Adjustment.

42. Doing so serves only to skew the data to meet Defendant's unjustified, unsupported, and uninvestigated assumption that the list price of comparable vehicles should always be reduced to pay insureds less.

43. Defendant further fails to control whether the vehicle was purchased with discounts unavailable to the public (e.g., employee discounts).

44. Defendant also fails to control for whether the vehicle was purchased with cash, or whether there were ancillary purchases or transactions that may influence the recorded "sales price" but not the ACV (e.g., whether the customer traded in a vehicle at the time of purchase, bought an extended warranty or service plan, or financed the purchase).

45. In these instances, the ACV of the vehicle remains its price to market; the dealership simply transferred the anticipated profit through either the sale of an optional ancillary product or by reducing what it would have offered in trade-in value.

46. The impropriety and arbitrariness of Defendant's Projected Sold Adjustments are further demonstrated by the fact that Mitchell's primary competitor in providing valuation reports to insurance companies—CCC Intelligent Solutions, Inc.—does not apply projected sold adjustments in this manner. Instead, CCC Intelligent Solutions uses list prices.

47. On information and belief, the impropriety and arbitrariness of Defendant's Projected Sold Adjustments are further demonstrated by the fact that Progressive does not apply these adjustments when determining the ACV of total losses in California or Washington. There is no justification for applying these adjustments when valuing total losses in Nevada while not subjecting California and

1  Washington insureds to the same negative adjustments.

2      48.    Plaintiff and each member of the proposed Class was damaged by

3  Defendant's application of these Projected Sold Adjustments because they were not

4  paid the ACV they would have received had Defendant applied proper methodologies

5  and appraisal standards.

6      49.    Were it not for this deceptive and improper adjustment, the "Base

7  Value" in each valuation report would have been higher, resulting in a higher

8  "settlement value" and in turn a higher payment by Defendant for ACV.

9  Specifically, for Plaintiff, were it not for this deceptive and improper adjustment, the

10  payment of ACV by Defendant would have been $814.50 higher, before adding the

11  related increase in payments for applicable sales taxes.

12                    **CLASS ACTION ALLEGATIONS**

13      50.    Plaintiff brings this action individually and as a class action under Fed.

14  R. Civ. P 23(a) and (b), on behalf of the following proposed Class:

15  All Nevada citizens insured by Progressive who, from the earliest allowable time

16  through the date an Order granting class certification is entered, received

17  compensation for the total loss of a covered vehicle, where that compensation was

18  based on a vehicle valuation report prepared by Mitchell and the ACV was decreased

19  based upon Projected Sold Adjustments to the comparable vehicles used to determine

20  ACV.

21      51.    Plaintiff is the proposed class representative for the Class. Excluded

22  from the Class are Defendant and any of its members, affiliates, parents, subsidiaries,

23  officers, directors, employees, successors, or assigns; governmental entities; and the

24  Judge(s) and Court staff assigned to this case and their immediate family members.

25      52.    Plaintiff reserves his right to amend the Class definition if discovery

26  and further investigation reveal that any Class should be expanded or narrowed,

27  divided into additional subclasses, or modified in any other way.

28      53.    **Numerosity.** The members of the Class are so numerous that individual

CLASS ACTION COMPLAINT

joinder of all Class members is impracticable. While Plaintiff is informed and believes that there are thousands of Class members, the precise number is unknown to Plaintiff but may be ascertained from Defendant's books and records. Class members may be notified of the pendency of this action by recognized Court-approved notice dissemination methods, which may include U.S. Mail, electronic mail, Internet postings, and/or published notice.

54. **Commonality and Predominance.** This action involves common questions of law and fact, which predominate over any questions affecting individual Class members, including, without limitation:

a) Whether Defendant systemically used Mitchell's Vehicle Valuation Reports in adjusting total loss claims to determine ACV;

b) Whether the Mitchell Vehicle Valuation Reports included Projected Sold Adjustments to the value of the comparable vehicles that reduced the base value, and thus the claim amount paid by Defendant for the ACV of Plaintiff's and Class members' total loss vehicles;

c) Whether Defendant's improper practices injured Plaintiff and members of the Class;

d) Whether Defendant's acts violated its obligations under the policy of insurance;

e) Whether Plaintiff and the Class are entitled to compensatory damages, and if so, the calculation of damages; and

f) Whether Plaintiff and Class members are entitled to an injunction restraining Progressive's future acts and practices.

55. **Typicality.** The claims of the Plaintiff, who is the representative of the Class herein, are typical of the claims of the proposed Class, in that the claims of all members of the proposed Class, including the Plaintiff, depend on a showing of the acts of Progressive giving rise to the right of Plaintiff to the relief sought herein. There is no conflict between the individually named Plaintiff and the other members

CLASS ACTION COMPLAINT

of the proposed Class with respect to this action, or with respect to the claims for relief set forth herein.

56.      **Adequacy of Representation.** Plaintiff is an adequate representative of the Class because Plaintiff's interests do not conflict with the interests of the other Class members whom he seeks to represent, Plaintiff has retained counsel competent and experienced in complex class action litigation, including successfully litigating class action cases similar to this one, where insurers breached contracts with insureds. The interests of the Class will be fairly and adequately protected by Plaintiff and his counsel.

57.      **Superiority.** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiff and the other Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendant, such that it would be impracticable for the Class members to individually seek redress for Defendant's wrongful conduct. Even if the Class members could afford litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## CAUSES OF ACTION

## COUNT I

## VIOLATION OF THE NEVADA DECEPTIVE TRADE PRACTICES ACT

## NEV. REV. STAT. § 598.0903, *et seq.*

58.      Plaintiff hereby repeats and realleges all preceding paragraphs contained herein.

59.     This claim is brought by Plaintiff on behalf of the Class.

60.     The Nevada Deceptive Trade Practices Act ("Nevada DTPA") prohibits deceptive trade practices. Nev. Rev. Stat. § 598.0903, *et seq*.

61.     As alleged herein, Defendant, through its agents, employees, and/or subsidiaries, violated the Nevada DTPA by knowingly and intentionally concealing and failing to disclose material facts regarding its application of an arbitrary Projected Sold Adjustment to comparable vehicles in order to reduce their market value and, as a result, the amount of Defendant's total-loss payments to insureds, as detailed above.

62.     Defendant also failed to comply with Nevada law by "[m]isrepresenting to insureds or claimants pertinent facts or insurance policy provisions relating to any coverage at issue"; "[f]ailing to effectuate prompt, fair and equitable settlements of claims in which liability of the insurer has become reasonably clear"; "[c]ompelling insureds to institute litigation to recover amounts due under an insurance policy by offering substantially less than the amounts ultimately recovered in actions brought by such insureds, when the insureds have made claims for amounts reasonably similar to the amounts ultimately recovered"; and "[a]ttempting to settle a claim by an insured for less than the amount to which a reasonable person would have believed he or she was entitled by reference to written or printed advertising material accompanying or made part of an application." Nev. Rev. Stat. § 686A.310(1).

63.     By knowingly and intentionally misrepresenting, omitting, concealing, and failing to disclose material facts regarding its application of an arbitrary Projected Sold Adjustment to comparable vehicles, and its failure to comply with Nevada law, as detailed above, Defendant engaged in one or more unfair or deceptive business practices prohibited by the Nevada DTPA.

64.     Defendant's misrepresentations and omissions regarding their application of an arbitrary Projected Sold Adjustment to comparable vehicles were made to Plaintiff and the Class members in a uniform manner.

CLASS ACTION COMPLAINT

65.     Defendant's unfair or deceptive acts or practices, including its misrepresentations, concealments, omissions, and suppression of material facts, as alleged herein, had a tendency or capacity to mislead and create a false impression in consumers' minds, and were likely to and, in fact, did deceive reasonable consumers, including Plaintiff and the Class members, about Defendant's application of an arbitrary Projected Sold Adjustment to comparable vehicles in order to reduce the amount of Defendant's total-loss payments to its insureds.

66.     The facts regarding Defendant's application of an arbitrary Projected Sold Adjustment to comparable vehicles that Defendant knowingly and intentionally misrepresented, omitted, concealed, and/or failed to disclose would be considered material by a reasonable consumer, and they were, in fact, material to Plaintiff and the Class members, who consider such facts to be important to their purchase decisions with respect to Defendant's insurance coverage.

67.     Plaintiff and Class members had no way of discerning that Defendant's representations were false and misleading, or otherwise learning the facts that Defendant had concealed or failed to disclose. Plaintiff and Class members did not, and could not, unravel Defendant's deception on their own.

68.     Defendant had an ongoing duty to Plaintiff and the Class members to refrain from engaging in unfair or deceptive practices under the Nevada DTPA in the course of its business. Specifically, Defendant owed Plaintiff and Class members a duty to disclose all the material facts concerning its application of an arbitrary Projected Sold Adjustment to comparable vehicles because Defendant possessed exclusive knowledge of those facts, it intentionally concealed those facts from Plaintiff and the Class members, and/or it made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

69.     Plaintiff and the Class members were aggrieved by Defendant's violations of the Nevada DTPA because they suffered ascertainable loss and actual damages as a direct and proximate result of Defendant's knowing and intentional

misrepresentations, omissions, concealments, and failures to disclose material facts regarding its application of an arbitrary Projected Sold Adjustment to comparable vehicles, including that the Projected Sold Adjustment is arbitrarily selected and applied, in an inconsistent manner designed to decrease Defendant's total-loss payments under the Policy.

70.    Plaintiff and the Class members purchased Defendant's insurance coverage in reliance on Defendant's misrepresentations, omissions, concealments, and/or failures to disclose material facts regarding its promise to pay ACV in the event of a total loss and Defendant's application of an arbitrary Projected Sold Adjustment to comparable vehicles to artificially reduce its total-loss payments to insureds.

71.    Had Defendant not engaged in the deceptive acts and practices alleged herein, Plaintiff and Class members would not have purchased insurance coverage from Defendant or would not have paid as much for it and, thus, they did not receive the benefit of the bargain and/or they suffered out-of-pocket loss.

72.    Defendant's violations of the Nevada DTPA present a continuing risk of future harm to Plaintiff and the Class members.

73.    Plaintiff and the Class members seek an order enjoining Defendant's unfair and deceptive acts or practices in violation of the Nevada DTPA and awarding actual damages, costs, attorneys' fees, and any other just and proper relief available under the Nevada DTPA.

## COUNT II
## BREACH OF CONTRACT

74.    Plaintiff hereby repeats and realleges all preceding paragraphs contained herein.

75.    This claim is brought by Plaintiff on behalf of the Class.

76.    Plaintiff made a claim for property damage on his Progressive insurance policy.

77.    At the time of his claim, and in the time since, Plaintiff has performed all obligations under his policy of insurance and was entitled to the benefits he contracted for in his policy.

78.    Through the use of improper and unfounded Projected Sold Adjustments in Mitchell vehicle valuation reports, as detailed above, Defendant handled, adjusted, and paid Plaintiff's claim, and the claims of the members of the proposed Class, for less than the ACV required by the insurance contract.

79.    As a direct result of Defendant's breaches, Plaintiff and members of the Class sustained actual damages. Plaintiff's damages are at least $814.50 (before calculation of additional sales tax benefits), plus pre-judgment and post-judgment interest.

## COUNT III

## BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING

80.    Plaintiff hereby repeats and realleges all preceding paragraphs contained herein.

81.    This claim is brought by Plaintiff on behalf of the Class.

82.    Every contract, including the Policy, contains an implied covenant of good faith and fair dealing. The purpose of this duty is to ensure that parties do not take advantage of each other in a way that could not have been contemplated at the time the contract was drafted or do anything that will destroy the other party's right to receive the benefit of the contract.

83.    Disputes involving the exercise of good faith arise when one party is given broad discretion in performing its obligations under the contract. Where a contract specifically vests one of the parties with broad discretion in performing a term of the contract, the covenant of good faith and fair dealing requires that the discretion be exercised reasonably and with proper motive, not arbitrarily, capriciously, or in a manner inconsistent with the reasonable expectations of the parties.

CLASS ACTION COMPLAINT

84.    To the extent the Policy provides Defendant with in calculating the ACV of an insured's total-loss vehicle, Defendant exercised its discretion unreasonably, with an improper motive, and in a manner that was arbitrary, capricious, and inconsistent with the reasonable expectations of the parties, specifically, to arbitrarily reduce the amount of their total-loss payments to insureds, as alleged herein.

85.    Defendant breached the covenant of good faith and fair dealing by, *inter alia*:

a)    Intentionally inventing and applying Projected Sold Adjustments to undervalue comparable vehicles, and, in turn, insureds' total-loss vehicles;

b)    Failing to conduct ***any*** investigation or study or research into whether the Projected Sold Adjustment (i) reflects the used auto market, (ii) is based on accurate data or extrapolations, (iii) is consistent with accepted appraisal methods and practices, or (iv) has any justification whatsoever;

c)    Failing to pay insureds the ACV of their total-loss vehicles;

d)    Interpreting the terms and conditions of their insurance policies in an unreasonable manner solely in an effort to understate the value of total-loss vehicles and avoid paying insureds the ACV on their total-loss claims;

e)    Inventing spurious grounds for undervaluing total loss claims that are hidden, not specific in dollar amount, not adequately explained, and unreasonable.

86.    Defendant's breaches of the covenant of good faith and fair dealing have caused damages to Plaintiff and the Class. Plaintiff's and the Class members' damages include the amounts improperly deducted by Defendant from its payments to insureds on the basis of a Projected Sold Adjustment

1

2

**COUNT IV**

**DECLARATORY JUDGMENT**

3       87.    Plaintiff hereby repeats and realleges all preceding paragraphs contained

4   herein.

5       88.    This claim is brought by Plaintiff on behalf of the Class.

6       89.    A judiciable dispute between Plaintiff and the proposed Class and the

7   Defendant is before this Court under 28 U.S.C. § 2201, *et seq.*, concerning the

8   construction of the auto insurance policies issued by Defendant and the rights arising

9   under those policies.

10       90.    Plaintiff, for himself and on behalf of the Class, seeks a declaration of

11   rights and liabilities of the parties herein. Specifically, Plaintiff is seeking a

12   declaration that in paying total loss claims with first-party insureds, it is a breach of

13   the insurance contract with Progressive for Progressive to base the valuation and

14   payment of claims on values of comparable vehicles that have been reduced by

15   factually erroneous Projected Sold Adjustments.

16       91.    Progressive's unlawful common policy and general business practice of

17   applying Projected Sold Adjustments is ongoing. Accordingly, Progressive has

18   breached, and continues to breach, the express terms of its contracts of insurance with

19   Plaintiff and members of the Class requiring it to settle total loss claims on the basis

20   of the total loss vehicle's ACV.

21       92.    As a result of these breaches of contract, Plaintiff and the proposed Class

22   members have been injured. Plaintiff's and proposed Class members' damages

23   include the amounts illegally deducted by Progressive from the insureds' payments.

24       93.    Plaintiff seeks a declaration that Progressive's application of unfounded

25   Projected Sold Adjustments results in a valuation of less than the ACV Progressive is

26   required under its insurance contracts to pay insureds.

27

28

CLASS ACTION COMPLAINT

# PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, respectfully requests that this Court:

a)      determine that this action may be maintained as a class action under Federal Rule of Civil Procedure 23, certify the proposed Class for class treatment, appoint Plaintiff as class representative for the Class, and appoint undersigned counsel as Class Counsel;

b)      enter an order finding that Defendant's actions described herein constitute breaches of the express terms of its policies of insurance;

c)      award Plaintiff and members of the Class actual damages according to proof;

d)      enter a declaratory judgment that in paying total loss claims with first-party insureds, it is a breach of the insurance contract with Defendant for Defendant to base the valuation and payment of claims on values of comparable vehicles that have been reduced by Projected Sold Adjustments;

e)      enter further belief based on the declaratory judgment including an order enjoining Defendant from basing the valuation and payment of claims on values of comparable vehicles that have been reduced by Projected Sold Adjustments;

f)      award pre-judgment and post-judgment interest at the maximum rate permitted by applicable law;

g)      award reasonable attorney's fees and litigation costs and expenses pursuant to applicable law; and

h)      grant any such other legal and equitable relief as the Court may deem appropriate, including specific performance as an alternative to damages.

CLASS ACTION COMPLAINT

1

<u>**DEMAND FOR JURY TRIAL**</u>

2         Plaintiff, on behalf of himself and the putative class, hereby demands a trial by

3  jury pursuant on all issues so triable.

4

5  DATED this 17th day of August 2022.

6                          Respectfully submitted,

7                          **KAZEROUNI LAW GROUP, APC**

8

9            By:   *s/ Mona Amini*

10                          Gustavo Ponce, Esq.
Mona Amini, Esq.

11                          6069 S. Fort Apache Road, Suite 100
Las Vegas, Nevada 89148

12                          Telephone: (800) 400-6808
Facsimile:  (800) 520-5523

13                          **SHAMIS & GENTILE, P.A.**

14                          Andrew J. Shamis, Esq.*
Florida Bar No. 101754

15                          ashamis@shamisgentile.com
14 NE 1st Avenue, Suite 705

16                          Miami, Florida 33132
Telephone: 305-479-2299

17                          **EDELSBERG LAW, P.A.**

18                          Scott Edelsberg, Esq.*
Florida Bar No. 0100537

19                          Christopher Gold, Esq.*
Florida Bar No. 088733

20                          scott@edelsberglaw.com
chris@edelsberglaw.com

21                          20900 NE 30th Ave., Suite 417
Aventura, FL 33180

22                          Office: (786) 289-9471
Direct: (305) 975-3320

23                          Fax: (786) 623-0915

24                          *\* pro hac vice forthcoming*

25                          *Attorneys for Plaintiff Gary
Yaghyazarian and the Putative Class*

26

27

28

CLASS ACTION COMPLAINT

# EXHIBIT A

**9611D NV 0116**

# NEVADA
## AUTO POLICY

Form 9611D NV (01/16)
version 2.0



**CONTENTS**

**INSURING AGREEMENT** ............................................................................ 1

**GENERAL DEFINITIONS** ........................................................................... 1

**PART I—LIABILITY TO OTHERS**
    Insuring Agreement..........................................................................3
    Additional Definition .......................................................................3
    Additional Payments........................................................................3
    Exclusions .........................................................................................4
    Limits of Liability.............................................................................5
    Financial Responsibility Laws .......................................................6
    Other Insurance ...............................................................................6
    Out-of-State Coverage .....................................................................6

**PART II—MEDICAL PAYMENTS COVERAGE**
    Insuring Agreement..........................................................................7
    Additional Definitions......................................................................7
    Exclusions .........................................................................................7
    Limits of Liability.............................................................................9
    Unreasonable or Unnecessary Medical Expenses .....................9
    Other Insurance .............................................................................10

**PART III—UNINSURED/UNDERINSURED MOTORIST COVERAGE**
    Insuring Agreement........................................................................10
    Additional Definitions....................................................................10
    Exclusions .......................................................................................11
    Limits of Liability...........................................................................12
    Other Insurance .............................................................................14

**PART IV—DAMAGE TO A VEHICLE**
    Insuring Agreement—Collision Coverage ..................................14
    Insuring Agreement—Comprehensive Coverage ......................14
    Insuring Agreement—Full Comprehensive Window Glass Coverage........15
    Insuring Agreement—Additional Custom Parts or
      Equipment Coverage .................................................................15
    Insuring Agreement—Rental Reimbursement Coverage...........15
    Insuring Agreement—Loan/Lease Payoff Coverage .................16
    Insuring Agreement—Pet Injury Coverage.................................16
    Additional Definitions....................................................................17
    Exclusions .......................................................................................17
    Limits of Liability...........................................................................18
    Payment of Loss.............................................................................20
    No Benefit to Bailee ......................................................................20
    Loss Payable Clause......................................................................20
    Other Sources of Recovery...........................................................20
    Appraisal ........................................................................................21

**PART V—ROADSIDE ASSISTANCE COVERAGE**

Insuring Agreement ....................................................................................21
Additional Definitions ................................................................................21
Exclusions ................................................................................................22
Unauthorized Service Provider ................................................................22
Other Insurance ........................................................................................22


**PART VI—DUTIES IN CASE OF AN ACCIDENT OR LOSS** ...........................23


**PART VII—GENERAL PROVISIONS**

Policy Period and Territory ........................................................................23
Changes ....................................................................................................23
Duty to Report Changes ...........................................................................24
Settlement of Claims .................................................................................24
Terms of Policy Conformed to Statutes ....................................................25
Transfer of Interest ...................................................................................25
Fraud or Misrepresentation .......................................................................25
Payment of Premium and Fees .................................................................26
Cancellation ..............................................................................................26
Cancellation Refund ..................................................................................27
Nonrenewal ...............................................................................................27
Automatic Termination ..............................................................................28
Legal Action Against Us ............................................................................28
Our Rights to Recover Payment ...............................................................28
Joint and Individual Interests .....................................................................29
Bankruptcy ................................................................................................29

## INSURING AGREEMENT

In return for **your** payment of the premium, **we** agree to insure **you** subject to all the terms, conditions and limitations of this policy. **We** will insure **you** for the coverages and the limits of liability shown on this policy's **declarations page**. **Your** policy consists of the policy contract, **your** insurance application, the **declarations page**, and all endorsements to this policy.

## GENERAL DEFINITIONS

The following definitions apply throughout the policy. Defined terms are printed in boldface type and have the same meaning whether in the singular, plural, or any other form.

1. "**Additional auto**" means an **auto you** become the owner of during the policy period that does not permanently replace an **auto** shown on the **declarations page** if:
   a. **we** insure all other **autos you** own;
   b. the **additional auto** is not covered by any other insurance policy;
   c. **you** notify **us** within 30 days of becoming the owner of the **additional auto**; and
   d. **you** pay any additional premium due.

   An **additional auto** will have the broadest coverage **we** provide for any **auto** shown on the **declarations page**. If **you** ask **us** to insure an **additional auto** more than 30 days after **you** become the owner, any coverage **we** provide will begin at the time **you** request coverage.
2. "**Auto**" means a land motor vehicle:
   a. of the private passenger, pickup body, or cargo van type;
   b. designed for operation principally upon public roads;
   c. with at least four wheels; and
   d. with a gross vehicle weight rating of 12,000 pounds or less, according to the manufacturer's specifications.

   However, "**auto**" does not include step-vans, parcel delivery vans, or cargo cutaway vans or other vans with cabs separate from the cargo area.
3. "**Auto business**" means the business of selling, leasing, repairing, parking, storing, servicing, delivering or testing vehicles.
4. "**Bodily injury**" means bodily harm, sickness, or disease, including death that results from bodily harm, sickness, or disease.
5. "**Covered auto**" means:
   a. any **auto** or **trailer** shown on the **declarations page** for the coverages applicable to that **auto** or **trailer**;
   b. any **additional auto**;
   c. any **replacement auto**; or
   d. a **trailer** owned by **you**.
6. "**Declarations page**" means the document showing **your** coverages, limits of liability, **covered autos**, premium, and other policy-related information. The **declarations page** may also be referred to as the Auto Insurance Coverage Summary.

1

7. "**Occupying**" means in, on, entering or exiting.

8. "**Personal vehicle sharing program**" means a system or process, operated by a business, organization, network, group, or individual, that facilitates the sharing of private passenger motor vehicles for use by individuals, businesses, or other entities.

9. "**Property damage**" means physical damage to, destruction of, or loss of use of, tangible property.

10. "**Rated resident**" means a person residing in the same household as **you** at the time of the loss who is not a **relative**, but only if that person is both:
    a. listed in the "Drivers and household residents" section on the **declarations page**; and
    b. not designated as either an "Excluded" or a "List Only" driver.

11. "**Relative**" means a person residing in the same household as **you**, and related to **you** by blood, marriage, domestic partnership pursuant to Nevada law, or adoption, and includes a ward, stepchild, or foster child. **Your** unmarried dependent children temporarily away from home will qualify as a **relative** if they intend to continue to reside in **your** household.

12. "**Replacement auto**" means an **auto** that permanently replaces an **auto** shown on the **declarations page**. A **replacement auto** will have the same coverage as the **auto** it replaces if the **replacement auto** is not covered by any other insurance policy. However, if the **auto** being replaced had coverage under Part IV—Damage To A Vehicle, such coverage will apply to the **replacement auto** only during the first 30 days after **you** become the owner unless **you** notify **us** within that 30-day period that **you** want **us** to extend coverage beyond the initial 30 days. If the **auto** being replaced did not have coverage under Part IV—Damage To A Vehicle, such coverage may be added, but the **replacement auto** will have no coverage under Part IV until **you** notify **us** of the **replacement auto** and ask **us** to add the coverage.

13. "**Ride-sharing activity**" means the use of any vehicle to provide transportation of persons or property in connection with a **transportation network company** from the time a user logs on to, or signs in to, any online-enabled application, software, website or system until the time the user logs out of, or signs off of, any such online-enabled application, software, website or system, whether or not the user has accepted any passenger(s) or delivery assignment, including the time the user is on the way to pick up any passenger(s) or property, or is transporting any passenger(s) or property.

14. "**Trailer**" means a non-motorized trailer, including a farm wagon or farm implement, designed to be towed on public roads by an **auto** and not being used:
    a. for commercial purposes;
    b. as an office, store, or for display purposes; or
    c. as a passenger conveyance.

15. "**Transportation network company**" means a corporation, partnership, sole proprietorship, or other entity that uses any online-enabled application, software, website or system to connect drivers with clients or passengers to facilitate and/or provide transportation or delivery services for compensation or a fee.

16. "**We**," "**us**" and "**our**" mean the underwriting company providing the insurance, as shown on the **declarations page**.

2

17. **You** and **your** mean:
  a. a person shown as a named insured on the **declarations page**; and
  b. the following person, if residing in the same household as a named insured at the time of the loss:
     (i)  the spouse of that named insured; or
     (ii) a person who has entered into a domestic partnership with that named insured pursuant to Nevada law.

## PART I—LIABILITY TO OTHERS

### INSURING AGREEMENT

If **you** pay the premium for this coverage, **we** will pay damages for **bodily injury** and **property damage** for which an **insured person** becomes legally responsible because of an accident.

Damages include prejudgment interest awarded against an **insured person**.

**We** will settle or defend, at **our** option, any claim for damages covered by this Part I.

### ADDITIONAL DEFINITION

When used in this Part I:
"**Insured person**" means:
a. **you**, a **relative**, or a **rated resident** with respect to an accident arising out of the ownership, maintenance or use of an **auto** or a **trailer**;
b. any person with respect to an accident arising out of that person's use of a **covered auto** with the permission of **you**, a **relative**, or a **rated resident**;
c. any person or organization with respect only to vicarious liability for the acts or omissions of a person described in a. or b. above; and
d. any "Additional Interest" shown on the **declarations page** with respect only to its liability for the acts or omissions of a person described in a. or b. above.

### ADDITIONAL PAYMENTS

In addition to **our** limit of liability, **we** will pay for an **insured person**:
1. all expenses **we** incur in the settlement of any claim or defense of any lawsuit;
2. interest accruing after entry of judgment, until **we** have paid, offered to pay, or deposited in court, that portion of the judgment which does not exceed **our** limit of liability. This does not apply if **we** have not been given notice of suit or the opportunity to defend an **insured person**;
3. the premium on any appeal bond or attachment bond required in any lawsuit **we** defend. **We** have no duty to purchase a bond in an amount exceeding **our** limit of liability, and **we** have no duty to apply for or furnish these bonds;
4. up to $250 for a bail bond required because of an accident resulting in **bodily injury** or **property damage** covered under this Part I. **We** have no duty to apply for or furnish this bond; and

3

5. reasonable expenses, including loss of earnings up to $200 per day, incurred at **our** request.

**EXCLUSIONS—READ THE FOLLOWING EXCLUSIONS CAREFULLY. IF AN EX-CLUSION APPLIES, COVERAGE WILL NOT BE AFFORDED UNDER THIS PART I.**

Coverage under this Part I, including **our** duty to defend, will not apply to any **insured person** for:

1. **bodily injury** or **property damage** arising out of the ownership, maintenance or use of any vehicle or trailer while being used:
   a. to carry persons or property for compensation or a fee;
   b. for retail or wholesale delivery, including, but not limited to, the pickup, transport or delivery of magazines, newspapers, mail or food; or
   c. for **ride-sharing activity**.
   This exclusion does not apply to shared-expense car pools;
2. any liability assumed under any contract or agreement by **you**, a **relative**, or a **rated resident**;
3. **bodily injury** to an employee of that **insured person** arising out of or within the course of employment. This exclusion does not apply to domestic employees if benefits are neither paid nor required to be provided under workers' compensation, disability benefits, or similar laws;
4. **bodily injury** or **property damage** arising out of an accident involving any vehicle while being maintained or used by a person while employed or engaged in any **auto business**. This exclusion does not apply to **you**, a **relative**, a **rated resident**, or an agent or employee of **you**, a **relative**, or a **rated resident**, when using a **covered auto**;
5. **bodily injury** or **property damage** resulting from, or sustained during practice or preparation for:
   a. any pre-arranged or organized racing, stunting, speed or demolition contest or activity; or
   b. any driving activity conducted on a permanent or temporary racetrack or race-course;
6. **bodily injury** or **property damage** due to a nuclear reaction or radiation;
7. **bodily injury** or **property damage** for which insurance:
   a. is afforded under a nuclear energy liability insurance contract; or
   b. would be afforded under a nuclear energy liability insurance contract but for its termination upon exhaustion of its limit of liability;
8. any obligation for which the United States Government is liable under the Federal Tort Claims Act;
9. **bodily injury** or **property damage** caused by an intentional act of that **insured person**, or at the direction of that **insured person**, even if the actual injury or damage is different than that which was intended or expected;
10. **property damage** to any property owned by, rented to, being transported by, used by, or in the charge of that **insured person**. This exclusion does not apply to a rented residence or a rented garage;

4

11. **bodily injury** or **property damage** arising out of the ownership, maintenance or use of any vehicle owned by **you** or furnished or available for **your** regular use, other than a **covered auto** for which this coverage has been purchased;

12. **bodily injury** or **property damage** arising out of the ownership, maintenance or use of any vehicle owned by a **relative** or a **rated resident** or furnished or available for the regular use of a **relative** or a **rated resident**, other than a **covered auto** for which this coverage has been purchased. This exclusion does not apply to **your** maintenance or use of such vehicle;

13. **bodily injury** or **property damage** arising out of **your**, a **relative's**, or a **rated resident's** use of a vehicle, other than a **covered auto**, without the permission of the owner of the vehicle or the person in lawful possession of the vehicle;

14. **bodily injury** or **property damage** arising out of the use of a **covered auto** while leased or rented to others or given in exchange for any compensation, including while being used in connection with a **personal vehicle sharing program**. This exclusion does not apply to the operation of a **covered auto** by **you**, a **relative**, or a **rated resident**;

15. punitive or exemplary damages; or

16. **bodily injury** or **property damage** caused by, or reasonably expected to result from, a criminal act or omission of that **insured person**. This exclusion applies regardless of whether that **insured person** is actually charged with, or convicted of, a crime. For purposes of this exclusion, criminal acts or omissions do not include traffic violations.

**LIMITS OF LIABILITY**

> **THE LIMIT OF LIABILITY SHOWN ON THE DECLARATIONS PAGE FOR LIABILITY COVERAGE IS THE MOST WE WILL PAY REGARDLESS OF THE NUMBER OF:**
> 1. **CLAIMS MADE;**
> 2. **COVERED AUTOS;**
> 3. **INSURED PERSONS;**
> 4. **LAWSUITS BROUGHT;**
> 5. **VEHICLES INVOLVED IN THE ACCIDENT; OR**
> 6. **PREMIUMS PAID.**
>
> **LIABILITY COVERAGE ON AUTOS INSURED BY US CANNOT BE ADDED, COMBINED OR STACKED TOGETHER.**

If **your declarations page** shows a split limit:

1. the amount shown for "each person" is the most **we** will pay for all damages due to **bodily injury** to one person resulting from any one accident;

2. subject to the "each person" limit, the amount shown for "each accident" is the most **we** will pay for all damages due to **bodily injury** sustained by two or more persons in any one accident; and

3. the amount shown for "property damage" is the most **we** will pay for the total of all **property damage** resulting from any one accident.

5

The each person limit of liability applies to the total of all claims made for **bodily injury** to a person and all claims of others derived from such **bodily injury**, including, but not limited to, emotional injury or mental anguish resulting from the **bodily injury** of another or from witnessing the **bodily injury** to another, loss of society, loss of companionship, loss of services, loss of consortium, and wrongful death.

If the **declarations page** shows that "combined single limit" or "CSL" applies, the amount shown is the most **we** will pay for the total of all damages resulting from any one accident. However, without changing this limit of liability, **we** will comply with any law that requires **us** to provide any separate limits.

No one is entitled to duplicate payments for the same elements of damages.

Any payment to a person under this Part I will be reduced by any payment to that person under Part III—Uninsured/Underinsured Motorist Coverage.

**We** will not pay under this Part I any expenses paid under Part II—Medical Payments Coverage.

If multiple auto policies issued by **us** are in effect for **you**, **we** will pay no more than the highest limit of liability for this coverage available under any one policy.

An **auto** and attached **trailer** are considered one **auto**. Therefore, the limits of liability will not be increased for an accident involving an **auto** that has an attached **trailer**.

## FINANCIAL RESPONSIBILITY LAWS

When **we** certify this policy as proof of financial responsibility, this policy will provide coverage in accordance with and subject to Chapter 485 of the Nevada Revised Statutes, and will comply with the law to the extent required. The **insured person** must reimburse **us** if **we** make a payment that **we** would not have made if this policy was not certified as proof of financial responsibility.

## OTHER INSURANCE

If there is any other applicable liability insurance or bond, **we** will pay only **our** share of the damages. **Our** share is the proportion that **our** limit of liability bears to the total of all applicable limits. However, any insurance **we** provide for a vehicle or trailer, other than a **covered auto**, will be excess over any other collectible insurance, self-insurance, or bond.

## OUT-OF-STATE COVERAGE

If an accident to which this Part I applies occurs in any state, territory or possession of the United States of America or any province or territory of Canada, other than the one in which a **covered auto** is principally garaged, and the state, province, territory or possession has:
1. a financial responsibility or similar law requiring limits of liability for **bodily injury**

6

or **property damage** higher than the limits shown on the **declarations page**, this policy will provide the higher limits; or
2. a compulsory insurance or similar law requiring a non-resident to maintain insurance whenever the non-resident uses an **auto** in that state, province, territory or possession, this policy will provide the greater of:
   a. the required minimum amounts and types of coverage; or
   b. the limits of liability under this policy.

## PART II—MEDICAL PAYMENTS COVERAGE

### INSURING AGREEMENT

If **you** pay the premium for this coverage, **we** will pay the reasonable expenses incurred for necessary **medical services** received within three years from the date of a **motor vehicle** accident because of **bodily injury**:
1. sustained by an **insured person**; and
2. caused by that **motor vehicle** accident.

**We**, or someone on **our** behalf, will determine:
1. whether the expenses for **medical services** are reasonable; and
2. whether the **medical services** are necessary.

### ADDITIONAL DEFINITIONS

When used in this Part II:
1. "**Insured person**" means:
   a. **you**, a **relative**, or a **rated resident**:
      (i) while **occupying** an **auto**; or
      (ii) when struck by a **motor vehicle** or a trailer while not **occupying** a self-propelled motorized vehicle; and
   b. any other person while **occupying** a **covered auto** with the permission of **you**, a **relative**, or a **rated resident**.
2. "**Medical services**" means medical, surgical, dental, x-ray, ambulance, hospital, professional nursing, and funeral services, and includes the cost of eyeglasses, hearing aids, pharmaceuticals, orthopedics, and prosthetic devices.
3. "**Motor vehicle**" means a land motor vehicle designed for use principally on public roads.

### EXCLUSIONS—READ THE FOLLOWING EXCLUSIONS CAREFULLY. IF AN EXCLUSION APPLIES, COVERAGE WILL NOT BE AFFORDED UNDER THIS PART II.

Coverage under this Part II will not apply to **bodily injury**:
1. sustained by any person while **occupying** a **covered auto** while it is being used:
   a. to carry persons or property for compensation or a fee;
   b. for retail or wholesale delivery, including, but not limited to, the pickup, transport or delivery of magazines, newspapers, mail or food; or

c. for **ride-sharing activity**.

This exclusion does not apply to shared-expense car pools;

2. arising out of an accident involving a vehicle while being maintained or used by a person while employed or engaged in any **auto business**. This exclusion does not apply to **you**, a **relative**, a **rated resident**, or an agent or employee of **you**, a **relative**, or a **rated resident**, when using a **covered auto**;

3. to any person resulting from, or sustained during practice or preparation for:
   a. any pre-arranged or organized racing, stunting, speed or demolition contest or activity; or
   b. any driving activity conducted on a permanent or temporary racetrack or race-course;

4. due to a nuclear reaction or radiation;

5. for which insurance:
   a. is afforded under a nuclear energy liability insurance contract; or
   b. would be afforded under a nuclear energy liability insurance contract but for its termination upon exhaustion of its limit of liability;

6. for which the United States Government is liable under the Federal Tort Claims Act;

7. sustained by any person while **occupying** any vehicle or trailer while located for use as a residence or premises;

8. if workers' compensation benefits are available for the **bodily injury**;

9. sustained by any person while **occupying** or when struck by any vehicle owned by **you** or furnished or available for **your** regular use, other than a **covered auto** for which this coverage has been purchased;

10. sustained by any person while **occupying** or when struck by any vehicle owned by a **relative** or a **rated resident** or furnished or available for the regular use of a **relative** or a **rated resident**, other than a **covered auto** for which this coverage has been purchased. This exclusion does not apply to **you**;

11. to **you**, a **relative**, or a **rated resident,** while **occupying** any vehicle, other than a **covered auto**, without the permission of the owner of the vehicle or the person in lawful possession of the vehicle;

12. to any person while **occupying** a **covered auto** while leased or rented to others or given in exchange for any compensation, including while being used in connection with a **personal vehicle sharing program**. This exclusion does not apply to the operation of a **covered auto** by **you**, a **relative**, or a **rated resident**;

13. caused directly or indirectly by:
    a. war (declared or undeclared) or civil war;
    b. warlike action by any military force of any government, sovereign or other authority using military personnel or agents. This includes any action taken to hinder or defend against an actual or expected attack; or
    c. insurrection, rebellion, revolution, usurped power, or any action taken by a governmental authority to hinder or defend against any of these acts; or

14. caused by, or reasonably expected to result from, a criminal act or omission of an **insured person**. This exclusion applies regardless of whether the **insured person** is actually charged with, or convicted of, a crime. For purposes of this exclusion, criminal acts or omissions do not include traffic violations.

8

**THE LIMIT OF LIABILITY SHOWN ON THE DECLARATIONS PAGE FOR MEDI-CAL PAYMENTS COVERAGE IS THE MOST WE WILL PAY FOR EACH INSURED PERSON INJURED IN ANY ONE ACCIDENT, REGARDLESS OF THE NUMBER OF:**

1. **CLAIMS MADE;**
2. **COVERED AUTOS;**
3. **INSURED PERSONS;**
4. **LAWSUITS BROUGHT;**
5. **VEHICLES INVOLVED IN THE ACCIDENT;**
6. **PREMIUMS PAID; OR**
7. **POLICIES ISSUED BY US.**

**IF YOU HAVE MORE THAN ONE VEHICLE INSURED BY US, WE WILL NOT PAY ANY INSURED PERSON MORE THAN THE SINGLE HIGHEST LIMIT OF MEDICAL PAYMENTS COVERAGE WHICH WE PROVIDE ON ANY ONE VEHICLE FOR AN ACCIDENT OR LOSS. MEDICAL PAYMENTS COVERAGE ON VEHICLES INSURED BY US CANNOT BE ADDED, COMBINED OR STACKED TOGETHER.**

No one will be entitled to duplicate payments under this policy for the same elements of damages.

Any amount payable to an **insured person** under this Part II will be reduced by any amount paid or payable for the same expense under Part I—Liability To Others or Part III—Uninsured/Underinsured Motorist Coverage.

**UNREASONABLE OR UNNECESSARY MEDICAL EXPENSES**

If an **insured person** incurs expenses for **medical services** that **we** deem to be unreasonable or unnecessary, **we** may refuse to pay for those expenses and contest them.

If the medical service provider sues the **insured person** because **we** refuse to pay expenses for **medical services** that **we** deem to be unreasonable or unnecessary, **we** will pay any resulting defense costs, and any resulting judgment against the **insured person**, subject to the limit of liability for this coverage. **We** will choose the counsel. **We** will also pay reasonable expenses, including loss of earnings up to $200 per day, incurred at **our** request.

The **insured person** may not sue **us** for expenses for **medical services we** deem to be unreasonable or unnecessary unless the **insured person** paid the entire disputed amount to the medical service provider or the medical service provider has initiated collection activity against the **insured person** for the unreasonable or unnecessary expenses.

9

If there is other applicable **auto** medical payments insurance, **we** will pay only **our** share of the loss. **Our** share is the proportion that **our** limit of liability bears to the total of all applicable limits. However, any insurance **we** provide for an **insured person occupying** a vehicle or trailer, other than a **covered auto**, will be excess over any other **auto** insurance providing payments for **medical services**.

## PART III—UNINSURED/UNDERINSURED MOTORIST COVERAGE

### INSURING AGREEMENT

If **you** pay the premium for this coverage, **we** will pay for damages that an **insured person** is legally entitled to recover from the owner or operator of an **uninsured motor vehicle** or an **underinsured motor vehicle** because of **bodily injury**:
1. sustained by an **insured person**;
2. caused by an accident; and
3. arising out of the ownership, maintenance or use of an **uninsured motor vehicle** or an **underinsured motor vehicle**.

Any judgment or settlement for damages against an owner or operator of an **uninsured motor vehicle** or **underinsured motor vehicle** that arises out of a lawsuit brought without **our** written consent is not binding on **us**.

### ADDITIONAL DEFINITIONS

When used in this Part III:
1. "**Insured person**" means:
   a. **you**, a **relative**, or a **rated resident**, except when **occupying** a vehicle, other than a **covered auto**, without the express or implied permission of either the owner or the person in lawful possession of the vehicle;
   b. any person while operating a **covered auto** with the permission of **you**, a **relative**, or a **rated resident**;
   c. any person **occupying**, but not operating, a **covered auto** with the express or implied permission of **you** or a **relative**; and
   d. any person who is entitled to recover damages covered by this Part III because of **bodily injury** sustained by a person described in a., b. or c. above.
2. "**Underinsured motor vehicle**" means a land motor vehicle or trailer of any type to which a bodily injury liability bond or policy applies at the time of the accident, but the limit of liability for bodily injury is less than the damages that an **insured person** is entitled to recover from the owner or operator of the motor vehicle for **bodily injury**.
   An "**underinsured motor vehicle**" does not include any vehicle or equipment:
   a. owned by **you** or a **relative** or furnished or available for the regular use of **you** or a **relative**;
   b. operated on rails or crawler treads;
   c. designed mainly for use off public roads, while not on public roads;

10

    d. while located for use as a residence or premises;
    e. that is a **covered auto**;
    f. that is not owned by **you** or a **relative**, and for which coverage is provided under Part I—Liability To Others; or
    g. that is an **uninsured motor vehicle**.
3. "**Uninsured motor vehicle**" means a land motor vehicle or trailer of any type:
    a. to which no bodily injury liability bond or policy applies at the time of the accident;
    b. to which a bodily injury liability bond or policy applies at the time of the accident, but the bonding or insuring company:
      (i) denies coverage; or
      (ii) is insolvent or becomes so within two years after the accident;
    c. to which a bodily injury liability bond or policy applies at the time of the accident, but its limit of liability for bodily injury is less than the minimum limit of liability for bodily injury specified by the financial responsibility law of the state in which the **covered auto** is principally garaged;
    d. for which there is not available at the department of motor vehicles within 60 days of the accident evidence of financial responsibility as required by Chapter 485 of the Nevada Revised Statutes; or
    e. that is a hit-and-run vehicle whose owner or operator cannot be identified and which has physical contact with:
      (i) **you**, a **relative**, or a **rated resident**;
      (ii) a vehicle that **you**, a **relative**, or a **rated resident** are **occupying**; or
      (iii) a **covered auto**;
    provided that the **insured person**, or someone on his or her behalf, reports the accident to the police or civil authority within 24 hours or as soon as practicable after the accident.

An "**uninsured motor vehicle**" does not include any vehicle or equipment:
    a. owned by **you**, a **relative**, or a **rated resident** or furnished or available for the regular use of **you**, a **relative**, or a **rated resident**;
    b. owned or operated by a self-insurer under any applicable motor vehicle law, except a self-insurer that is or becomes insolvent;
    c. owned by any governmental unit or agency;
    d. operated on rails or crawler treads;
    e. designed mainly for use off public roads, while not on public roads;
    f. while located for use as a residence or premises;
    g. that is a **covered auto**; or
    h. that is an **underinsured motor vehicle**.

**EXCLUSIONS—READ THE FOLLOWING EXCLUSIONS CAREFULLY. IF AN EXCLUSION APPLIES, COVERAGE WILL NOT BE AFFORDED UNDER THIS PART III.**

Coverage under this Part III will not apply:
1. to **bodily injury** sustained by any person while using or **occupying**:
    a. a **covered auto** while being used:
      (i) to carry persons or property for compensation or a fee;

11

(ii) for retail or wholesale delivery, including, but not limited to, the pickup, transport or delivery of magazines, newspapers, mail or food; or

(iii) for **ride-sharing activity**.

This exclusion applies only to damages in excess of the minimum limit mandated by the motor vehicle financial responsibility law of Nevada. This exclusion does not apply to shared-expense car pools; or

b. a motor vehicle that is owned by or available for the regular use of **you**, a **relative**, or a **rated resident**. This exclusion does not apply to a **covered auto** that is insured under this Part III. This exclusion applies only to damages in excess of the minimum limit mandated by the motor vehicle financial responsibility law of Nevada;

2. directly or indirectly to benefit any insurer or self-insurer under any of the following or similar laws:
   a. workers' compensation law; or
   b. disability benefits law;

3. to any punitive or exemplary damages;

4. to **bodily injury** sustained by any person if that person or the legal representative of that person settles without **our** written consent; or

5. to **bodily injury** arising out of the use of a **covered auto** while being used in connection with a **personal vehicle sharing program**. This exclusion does not apply to the operation of a **covered auto** by **you**, a **relative**, or a **rated resident**.

**LIMITS OF LIABILITY**

**THE LIMIT OF LIABILITY SHOWN ON THE DECLARATIONS PAGE FOR UNINSURED/UNDERINSURED MOTORIST COVERAGE IS THE MOST WE WILL PAY REGARDLESS OF THE NUMBER OF:**

1. **CLAIMS MADE;**
2. **COVERED AUTOS;**
3. **INSURED PERSONS;**
4. **LAWSUITS BROUGHT;**
5. **VEHICLES INVOLVED IN THE ACCIDENT;**
6. **PREMIUMS PAID; OR**
7. **POLICIES ISSUED BY US.**

**IF YOU HAVE MORE THAN ONE VEHICLE INSURED BY US, WE WILL NOT PAY:**

1. **YOU OR A RELATIVE MORE THAN THE SINGLE HIGHEST LIMIT OF UNINSURED/UNDERINSURED MOTORIST COVERAGE WE PROVIDE ON ANY ONE VEHICLE FOR AN ACCIDENT OR LOSS; OR**
2. **ANY OTHER INSURED PERSON MORE THAN THE LIMIT OF LIABILITY SHOWN ON THE DECLARATIONS PAGE FOR THE COVERED AUTO OCCUPIED BY THAT PERSON AT THE TIME OF THE ACCIDENT.**

**UNINSURED/UNDERINSURED MOTORIST COVERAGE ON MORE THAN ONE VEHICLE CANNOT BE ADDED, COMBINED OR STACKED TOGETHER.**

If **your declarations page** shows a split limit:

1. the amount shown for "each person" is the most **we** will pay for all damages due to **bodily injury** to one person; and
2. subject to the "each person" limit, the amount shown for "each accident" is the most **we** will pay for all damages due to **bodily injury** sustained by two or more persons in any one accident.

The "each person" limit of liability includes the total of all claims made for **bodily injury** to an **insured person** and all claims of others derived from such **bodily injury**, including, but not limited to, emotional injury or mental anguish resulting from the **bodily injury** of another or from witnessing the **bodily injury** to another, loss of society, loss of companionship, loss of services, loss of consortium, and wrongful death.

If the **declarations page** shows that "combined single limit" or "CSL" applies, the amount shown is the most **we** will pay for the total of all damages resulting from any one accident. However, without changing this total limit of liability, **we** will comply with any law that requires **us** to provide any separate limits.

In determining the amount payable under this Part III, the amount of damages an **insured person** is entitled to recover for **bodily injury** will be reduced by all sums:

1. paid because of **bodily injury** by or on behalf of any persons or organizations that may be legally responsible;
2. paid under Part I—Liability To Others; and
3. paid or payable because of **bodily injury** under any of the following or similar laws:
   a. workers' compensation law; or
   b. disability benefits law, coverage or policy.

However, in no event will **we** pay an amount exceeding the limit of liability shown on the **declarations page** for Uninsured/Underinsured Motorist Coverage under this Part III.

Subject to the limits of liability under this Part III—Uninsured/Underinsured Motorist Coverage, the maximum amount **we** will pay for damages caused by the owner or operator of an **underinsured motor vehicle** shall be no more than the amount by which the **bodily injury** damages exceed the sum of all applicable limits of liability available to the owner and operator of the **underinsured motor vehicle**. If an **insured person** enters into a settlement agreement for an amount less than the sum of all applicable limits of liability for bodily injury, **our** limit of liability for Underinsured Motorist Coverage shall not exceed the difference between the damages sustained by the **insured person** and the sum of the applicable bodily injury liability limits.

**We** will not pay under this Part III any expenses paid or payable under Part II—Medical Payments Coverage.

No one will be entitled to duplicate payments for the same elements of damages.

13

If there is other applicable uninsured or underinsured motorist coverage, **we** will pay only **our** share of the damages. **Our** share is the proportion that **our** limit of liability bears to the total of all available coverage limits. However, any insurance **we** provide with respect to a vehicle that is not a **covered auto** will be excess over any other uninsured or underinsured motorist coverage.

## **PART IV—DAMAGE TO A VEHICLE**

### **INSURING AGREEMENT—COLLISION COVERAGE**

If **you** pay the premium for this coverage, **we** will pay for sudden, direct and accidental loss to a:

1.   **covered auto**, including an attached **trailer**; or
2.   **non-owned auto**;

and its **custom parts or equipment**, resulting from **collision**.

In addition, **we** will pay the reasonable cost to replace any child safety seat damaged in an accident to which this coverage applies.

### **INSURING AGREEMENT—COMPREHENSIVE COVERAGE**

If **you** pay the premium for this coverage, **we** will pay for sudden, direct and accidental loss to a:

1.   **covered auto**, including an attached **trailer**; or
2.   **non-owned auto**;

and its **custom parts or equipment**, that is not caused by **collision**.

A loss not caused by **collision** includes:

1.   contact with an animal (including a bird);
2.   explosion or earthquake;
3.   fire;
4.   malicious mischief or vandalism;
5.   missiles or falling objects;
6.   riot or civil commotion;
7.   theft or larceny;
8.   windstorm, hail, water or flood; or
9.   breakage of glass not caused by **collision**.

In addition, **we** will pay for:

1.   reasonable transportation expenses incurred by **you** if a **covered auto** is stolen; and
2.   loss of use damages that **you** are legally liable to pay if a **non-owned auto** is stolen.

A combined maximum of $900, not exceeding $30 per day, will apply to these additional benefits. The additional benefit for transportation expenses will not apply if **you** purchased Rental Reimbursement Coverage for the stolen **covered auto**.

14

coverage for transportation expenses and loss of use damages begins 48 hours after **you** report the theft to **us** and ends the earliest of:

1. when the **auto** has been recovered and returned to **you** or its owner;
2. when the **auto** has been recovered and repaired;
3. when the **auto** has been replaced; or
4. 72 hours after **we** make an offer to settle the loss if the **auto** is deemed by **us** to be a total loss.

**We** must receive written proof of transportation expenses and loss of use damages.

### INSURING AGREEMENT—COMPREHENSIVE WINDOW GLASS COVERAGE

If **your declarations page** shows that this coverage applies to **your** policy, **we** will pay under Comprehensive Coverage for loss, not caused by **collision**, to glass or plastic used in the windshield, backglass, windows, moonroof, or sunroof of a **covered auto**.

### INSURING AGREEMENT—ADDITIONAL CUSTOM PARTS OR EQUIPMENT COVERAGE

**We** will pay for sudden, direct and accidental loss to **custom parts or equipment** on a **covered auto** for which this coverage has been purchased. This coverage applies only if **you** have purchased both Comprehensive Coverage and Collision Coverage for that **covered auto** and the loss is covered under one of those coverages. This coverage applies in addition to any coverage automatically provided for **custom parts or equipment** under Comprehensive Coverage or Collision Coverage.

### INSURING AGREEMENT—RENTAL REIMBURSEMENT COVERAGE

**We** will reimburse rental charges incurred when **you** rent an **auto** from a rental agency or auto repair shop due to a loss to a **covered auto** for which Rental Reimbursement Coverage has been purchased. This coverage applies only if **you** have purchased both Comprehensive Coverage and Collision Coverage for that **covered auto** and the loss is covered under one of those coverages.

Additional fees or charges for insurance, damage waivers, optional equipment, fuel, or accessories are not covered.

This coverage is limited to the each day limit shown on the **declarations page** for a maximum of 30 days.

If Rental Reimbursement Coverage applies, no other coverage under this policy for rental expenses will apply.

Rental charges will be reimbursed beginning:
1. when the **covered auto** cannot be driven due to a loss; or
2. if the **covered auto** can be driven, when **you** deliver the **covered auto** to an auto repair shop or one of **our** Service Centers for repairs due to the loss;

15

and ending the earliest of:

1. when the **covered auto** has been returned to **you**;
2. when the **covered auto** has been repaired;
3. when the **covered auto** has been replaced;
4. 72 hours after **we** make an offer to settle the loss if the **covered auto** is deemed by **us** to be a total loss; or
5. when **you** incur 30 days worth of rental charges.

**You** must provide **us** written proof of **your** rental charges to be reimbursed.

#### INSURING AGREEMENT—LOAN/LEASE PAYOFF COVERAGE

If **you** pay the premium for this coverage, and the **covered auto** for which this coverage was purchased is deemed by **us** to be a total loss, **we** will pay, in addition to any amounts otherwise payable under this Part IV, the difference between:
1. the actual cash value of the **covered auto** at the time of the total loss; and
2. any greater amount the owner of the **covered auto** is legally obligated to pay under a written loan or lease agreement to which the **covered auto** is subject at the time of the total loss, reduced by:
   a. unpaid finance charges or refunds due to the owner for such charges;
   b. excess mileage charges or charges for wear and tear;
   c. charges for extended warranties or refunds due to the owner for extended warranties;
   d. charges for credit insurance or refunds due to the owner for credit insurance;
   e. past due payments and charges for past due payments; and
   f. collection or repossession expenses.

However, **our** payment under this coverage shall not exceed the limit of liability shown on the **declarations page**. The limit of liability is a percentage of the actual cash value of the **covered auto** at the time of the loss.

This coverage applies only if **you** have purchased both Comprehensive Coverage and Collision Coverage for that **covered auto** and the loss is covered under one of those coverages.

#### INSURING AGREEMENT—PET INJURY COVERAGE

If **you** have purchased Collision coverage for at least one **covered auto** under **your** policy, and if **your pet** sustains injury or death while inside a **covered auto** or **non-owned auto** at the time of a loss covered under Collision or Comprehensive coverage, **we** will provide:
1. up to $1,000 for reasonable and customary veterinary fees incurred by **you**, a **relative**, or a **rated resident** if **your pet** is injured in, or as a direct result of, the covered loss; or
2. a $1,000 death benefit if **your pet** dies in, or as a direct result of, the covered loss, less any payment **we** made toward veterinary expenses for **your pet**.

In the event of a covered loss due to the theft of a **covered auto** or **non-owned auto**,

16

**we** will provide the death benefit provided **your pet** is inside that auto at the time of the theft and **your pet** is not recovered.

## ADDITIONAL DEFINITIONS

When used in this Part IV:
1. "**Collision**" means the upset of a vehicle or its impact with another vehicle or object.
2. "**Custom parts or equipment**" means equipment, devices, accessories, enhancements and changes, other than those that are offered by the manufacturer specifically for that **auto** model, or that are installed by the auto dealership as part of the original sale of a new **auto**, that:
    a. are permanently installed or attached; and
    b. alter the appearance or performance of the **auto**.
3. "**Mechanical parts**" means operational parts on a vehicle that wear out over time or have a finite useful life or duration typically shorter than the life of the vehicle as a whole. **Mechanical parts** do not include external crash parts, wheels, paint, or windshields and other glass.
4. "**Non-owned auto**" means an **auto** that is not owned by or furnished or available for the regular use of **you**, a **relative**, or a **rated resident** while in the custody of or being operated by **you**, a **relative**, or a **rated resident** with the permission of the owner of the **auto** or the person in lawful possession of the **auto**.
5. "**Your pet**" means any dog or cat owned by **you**, a **relative**, or a **rated resident**.

## EXCLUSIONS—READ THE FOLLOWING EXCLUSIONS CAREFULLY. IF AN EXCLUSION APPLIES, COVERAGE WILL NOT BE AFFORDED UNDER THIS PART IV.

Coverage under this Part IV will not apply for loss:
1. to any vehicle while being used:
    a. to carry persons or property for compensation or a fee;
    b. for retail or wholesale delivery, including, but not limited to, the pickup, transport or delivery of magazines, newspapers, mail or food; or
    c. for **ride-sharing activity**.
    This exclusion does not apply to shared-expense car pools;
2. to a **non-owned auto** while being maintained or used by a person while employed or engaged in any **auto business**;
3. to any vehicle resulting from, or sustained during practice or preparation for:
    a. any pre-arranged or organized racing, stunting, speed or demolition contest or activity; or
    b. any driving activity conducted on a permanent or temporary racetrack or racecourse;
4. to any vehicle for which insurance:
    a. is afforded under a nuclear energy liability insurance contract; or
    b. would be afforded under a nuclear energy liability insurance contract but for its termination upon exhaustion of its limit of liability;
5. to any vehicle caused by an intentional act committed by or at the direction of **you**, a **relative**, a **rated resident**, or the owner of a **non-owned auto**, even if the actual damage is different than that which was intended or expected;

17

6. to a **covered auto** while it is leased or rented to others or given in exchange for compensation, including while being used in connection with a **personal vehicle sharing program**. This exclusion does not apply to the operation of a **covered auto** by **you**, a **relative**, or a **rated resident**;

7. due to destruction or confiscation by governmental or civil authorities of any vehicle because **you**, any **relative**, or any **rated resident** engaged in illegal activities;

8. to any vehicle that is due and confined to:
   a. wear and tear;
   b. freezing;
   c. mechanical, electrical or electronic breakdown or failure; or
   d. road damage to tires.

   This exclusion does not apply if the damage results from the theft of a vehicle;

9. to portable equipment, devices, accessories, and any other personal effects that are not permanently installed. This includes, but is not limited to:
   a. tapes, compact discs, cassettes, DVDs, and other recording or recorded media;
   b. any case or other container designed for use in storing or carrying tapes, compact discs, cassettes, DVDs, or other recording or recorded media;
   c. any device used for the detection or location of radar, laser, or other speed measuring equipment or its transmissions; and
   d. CB radios, telephones, two-way mobile radios, DVD players, personal computers, personal digital assistants, or televisions;

10. to any vehicle for diminution of value;

11. to any vehicle caused directly or indirectly by:
    a. war (declared or undeclared) or civil war;
    b. warlike action by any military force of any government, sovereign, or other authority using military personnel or agents. This includes any action taken to hinder or defend against an actual or expected attack; or
    c. insurrection, rebellion, revolution, usurped power, or any action taken by a governmental authority to hinder or defend against any of these acts; or

12. to any vehicle caused by, or reasonably expected to result from, a criminal act or omission of **you**, a **relative**, a **rated resident**, or the owner of a **non-owned auto**. This exclusion applies regardless of whether **you**, the **relative**, the **rated resident**, or the owner of the **non-owned auto** is actually charged with, or convicted of, a crime. For purposes of this exclusion, criminal acts or omissions do not include traffic violations.

## LIMITS OF LIABILITY

1. The limit of liability for loss to a **covered auto**, **non-owned auto**, or **custom parts or equipment** is the lowest of:
   a. the actual cash value of the stolen or damaged property at the time of the loss reduced by the applicable deductible;
   b. the amount necessary to replace the stolen or damaged property reduced by the applicable deductible;
   c. the amount necessary to repair the damaged property to its pre-loss condition reduced by the applicable deductible; or
   d. the Stated Amount shown on the **declarations page** for that **covered auto**.

18

However, the most **we** will pay for loss to:

    a. **custom parts or equipment** is \$1,000 unless **you** purchased Additional Custom Parts or Equipment Coverage ("ACPE"). If **you** purchased ACPE, the most **we** will pay is \$1,000 plus the amount of ACPE **you** purchased.

    b. a **trailer** is the limit of liability shown on the **declarations page** for that **trailer**. If the **trailer** is not shown on the **declarations page**, the limit of liability is \$500.

2. Payments for loss to a **covered auto**, **non-owned auto**, or **custom parts or equipment** are subject to the following provisions:

    a. If coverage applies to a **non-owned auto**, **we** will provide the broadest coverage applicable to any **covered auto** shown on the **declarations page**.

    b. If **you** have elected a Stated Amount for a **covered auto**, the Stated Amount is the most **we** will pay for all loss to that **covered auto**, including its **custom parts or equipment**.

    c. Coverage for **custom parts or equipment** will not cause **our** limit of liability for loss to an **auto** under this Part IV to be increased to an amount in excess of the actual cash value of the **auto**, including its **custom parts or equipment**.

    d. In determining the amount necessary to repair damaged property to its preloss condition, the amount to be paid by **us**:

        (i) will not exceed the prevailing competitive labor rates charged in the area where the property is to be repaired and the cost of repair or replacement parts and equipment, as reasonably determined by **us**; and

        (ii) will be based on the cost of repair or replacement parts and equipment which may be new, reconditioned, remanufactured or used, including, but not limited to:

            (a) original manufacturer parts or equipment; and

            (b) nonoriginal manufacturer parts or equipment.

    e. To determine the amount necessary to repair or replace the damaged property as referred to in subsection 1., the total cost of necessary repair or replacement may be reduced by unrepaired prior damage. Unrepaired prior damage includes broken, cracked or missing parts; rust; dents; scrapes; gouges; and peeling paint. The reduction for unrepaired prior damage is the cost of labor, parts and materials necessary to repair or replace damage, deterioration, defects, or wear and tear on exterior body parts, windshields and other glass, wheels, and paint, that existed prior to the accident and that is eliminated as a result of the repair or replacement of property damaged in the loss.

    f. To determine the amount necessary to repair or replace the damaged property as referred to in subsection 1., an adjustment may be made for betterment or depreciation and physical condition on:

        (i) batteries;

        (ii) tires;

        (iii) engines and transmissions, if the engine has greater than 80,000 miles; and

        (iv) any other **mechanical parts** that are nonfunctioning or inoperative.

        **We** will not make an adjustment for the labor costs associated with the replacement or repair of these parts.

    g. The actual cash value is determined by the market value, age, and condition of the vehicle at the time the loss occurs.

19

3. No deductible will apply to a loss to window glass when the glass is repaired instead of replaced.
4. Duplicate recovery for the same elements of damages is not permitted.
5. The following additional limits of liability apply to Pet Injury coverage:
    a. The most **we** will pay for all damages in any one loss is a total of $1,000 regardless of the number of dogs or cats involved.
    b. If **your pet** dies in, or as a direct result of, a covered loss, **we** will provide a death benefit of $1,000, less any payment **we** made toward veterinary expenses for **your pet**.
    c. No deductible shall apply to this coverage.

## PAYMENT OF LOSS

**We** may, at **our** option:
1. pay for the loss in money; or
2. repair or replace the damaged or stolen property.

At **our** expense, **we** may return any recovered stolen property to **you** or to the address shown on the **declarations page**, with payment for any damage resulting from the theft. **We** may keep all or part of the property at the agreed or appraised value.

**We** may settle any loss with **you** or the owner or lienholder of the property.

## NO BENEFIT TO BAILEE

Coverage under this Part IV will not directly or indirectly benefit any carrier or other bailee for hire.

## LOSS PAYABLE CLAUSE

Payment under this Part IV for a loss to a **covered auto** will be made according to **your** interest and the interest of any lienholder shown on the **declarations page** or designated by **you**. At **our** option, payment may be made to both jointly, or to either separately. However, if the **covered auto** is not a total loss, **we** may make payment to **you** and the repairer of the **auto**.

The lienholder's interest will not be protected:
1. where fraud, misrepresentation, material omission, or intentional damage resulting in a denial of coverage by **us** has been committed by or at the direction of **you** or any person seeking coverage; or
2. where the loss is otherwise not covered under the terms of this policy.
If this policy is cancelled, nonrenewed or voided, the interest of any lienholder under this agreement will also terminate.

## OTHER SOURCES OF RECOVERY

If other sources of recovery also cover the loss, **we** will pay only **our** share of the loss. **Our** share is the proportion that **our** limit of liability bears to the total of all applicable

20

limits. However, any insurance **we** provide for a **non-owned auto**, or **trailer** not shown on the **declarations page**, will be excess over any other collectible source of recovery including, but not limited to:
1. any coverage provided by the owner of the **non-owned auto** or **trailer**;
2. any other applicable physical damage insurance; and
3. any other source of recovery applicable to the loss.

## APPRAISAL

If **we** cannot agree with **you** on the amount of a loss, then **we** and **you** may agree to an independent appraisal of such loss. Within 30 days of such agreement, each party shall appoint a competent appraiser and shall notify the other party of that appraiser's identity. The appraisers will determine the amount of loss. If they fail to agree, the disagreement will be submitted to a qualified umpire chosen by the appraisers. If the two appraisers are unable to agree upon an umpire within 15 days, **we** or **you** may request that a judge of a court of record, in the county where **you** reside, select an umpire. The appraisers and umpire will determine the amount of loss. The amount of loss agreed to by both appraisers, or by one appraiser and the umpire, will be binding. **You** will pay **your** appraiser's fees and expenses. **We** will pay **our** appraiser's fees and expenses. All other expenses of the appraisal, including payment of the umpire if one is selected, will be shared equally between **us** and **you**. Neither **we** nor **you** waive any rights under this policy by agreeing to an appraisal.

## PART V—ROADSIDE ASSISTANCE COVERAGE

### INSURING AGREEMENT

If **you** pay the premium for this coverage, **we** will pay for **our** authorized service representative to provide the following services when necessary due to a **covered emergency**:
1. towing of a **covered disabled auto** to the nearest qualified repair facility; and
2. labor on a **covered disabled auto** at the place of disablement.

If a **covered disabled auto** is towed to any place other than the nearest qualified repair facility, **you** will be responsible for any additional charges incurred.

### ADDITIONAL DEFINITIONS

When used in this Part V:
1. "**Covered disabled auto**" means a **covered auto** for which this coverage has been purchased that sustains a **covered emergency**.
2. "**Covered emergency**" means a disablement that is a result of:
   a. mechanical or electrical breakdown;
   b. battery failure;
   c. insufficient supply of fuel, oil, water, or other fluid;
   d. flat tire;
   e. lock-out; or
   f. entrapment in snow, mud, water or sand within 100 feet of a road or highway.

21

**EXCLUSIONS – READ THE FOLLOWING EXCLUSIONS CAREFULLY. IF AN EX-CLUSION APPLIES, COVERAGE WILL NOT BE AFFORDED UNDER THIS PART V.**

Coverage under this Part V will not apply to:
1. more than three **covered emergencies** for any single **covered auto** in a six-month period;
2. the cost of purchasing parts, fluid, lubricants, fuel, or replacement keys, or the labor to make replacement keys;
3. installation of products or material not related to the disablement;
4. labor not related to the disablement;
5. labor on a **covered disabled auto** for any time period in excess of 60 minutes per disablement;
6. towing or storage related to impoundment, abandonment, illegal parking, or other violations of law;
7. assistance with jacks, levelers, airbags or awnings;
8. labor or repair work performed at a service station, garage, or repair shop;
9. auto storage charges;
10. disablement that occurs on roads not regularly maintained, sand beaches, open fields, or areas designated as not passable due to construction, weather, or earth movement;
11. mounting or removing of snow tires or chains;
12. tire repair;
13. disablement that results from an intentional or willful act or action by **you**, a **relative**, or the operator of a **covered disabled auto**;
14. any **covered auto** while being used in connection with **ride-sharing activity**;
15. any **covered auto** while being used in connection with a **personal vehicle sharing program**; or
16. a trailer.

## UNAUTHORIZED SERVICE PROVIDER

When service is rendered by a provider in the business of providing roadside assistance and towing services, other than one of **our** authorized service representatives, **we** will pay only reasonable charges, as determined by **us**, for:
1. towing of a **covered disabled auto** to the nearest qualified repair facility; and
2. labor on a **covered disabled auto** at the place of disablement;
which is necessary due to a **covered emergency**.

## OTHER INSURANCE

Any coverage provided under this Part V for service rendered by an unauthorized service provider will be excess over any other collectible insurance or towing protection coverage.

22

For coverage to apply under this policy, **you** or the person seeking coverage must promptly report each accident or loss even if **you** or the person seeking coverage is not at fault. **You** or the person seeking coverage must provide **us** with all accident or loss information, including time, place, and how the accident or loss happened. **You** or the person seeking coverage must also obtain and provide **us** the names and addresses of all persons involved in the accident or loss, the names and addresses of any witnesses, and the license plate numbers of the vehicles involved.

If **you** or the person seeking coverage cannot identify the owner or operator of a vehicle involved in the accident, or if theft or vandalism has occurred, **you** or the person seeking coverage must notify the police within 24 hours or as soon as practicable.

A person seeking coverage must:
1. cooperate with **us** in any matter concerning a claim or lawsuit;
2. provide any written proof of loss **we** may reasonably require;
3. allow **us** to take signed and recorded statements, including sworn statements and examinations under oath, which **we** may conduct outside the presence of **you** or any other person seeking coverage, and answer all reasonable questions **we** may ask as often as **we** may reasonably require;
4. promptly call to notify **us** about any claim or lawsuit and send **us** any and all legal papers relating to the claim or suit;
5. attend hearings and trials as **we** require;
6. take reasonable steps after a loss to protect the **covered auto**, or any other vehicle for which coverage is sought, from further loss. **We** will pay reasonable expenses incurred in providing that protection. If failure to provide such protection results in further loss, any additional damages will not be covered under this policy;
7. allow **us** to have the damaged **covered auto**, or any other damaged vehicle for which coverage is sought, inspected and appraised before its repair or disposal;
8. submit to medical examinations at **our** expense by doctors **we** select as often as **we** may reasonably require; and
9. authorize **us** to obtain medical and other records.

## PART VII—GENERAL PROVISIONS

### POLICY PERIOD AND TERRITORY

This policy applies only to accidents and losses occurring during the policy period shown on the **declarations page** and that occur within a state, territory or possession of the United States of America, or a province or territory of Canada, or while a **covered auto** is being transported between their ports.

### CHANGES

This policy contract, **your** insurance application (which is made a part of this policy as if attached hereto), the **declarations page**, and all endorsements to this policy issued by

**us**, contain all the agreements between **you** and **us**. Subject to the following, the terms of this policy may not be changed or waived except by an endorsement issued by **us**.

The premium for this policy is based on information **we** received from **you** and other sources. **You** agree to cooperate with **us** in determining if this information is correct and complete, and to promptly notify **us** if it changes during the policy period. If this information is determined by **us** to be incorrect, incomplete, or if it changes during the policy period, **you** agree that **we** may adjust **your** policy information and premium accordingly. Changes that may result in a premium adjustment are contained in **our** rates and rules. These include, but are not limited to, **you**, a **relative**, or a **rated resident** obtaining a driver's license or operator's permit, or changes in:

1. the number, type or use classification of **covered autos**;
2. the persons who regularly operate a **covered auto**;
3. the persons of legal driving age residing in **your** household;
4. the residents in **your** household;
5. an operator's marital or domestic partnership status;
6. **your** mailing address and **your** residence address;
7. the principal garaging address of any **covered auto**;
8. coverage, deductibles, or limits of liability; or
9. rating territory or discount eligibility.

The coverage provided in **your** policy may be changed only by the issuance of a new policy or an endorsement by **us**. However, if during the policy period **we** broaden any coverage afforded under the current edition of **your** policy without additional premium charge, that change will automatically apply to **your** policy as of the date the coverage change is implemented in **your** state.

If **you** ask **us** to delete a vehicle from this policy, no coverage will apply to that vehicle as of the date and time **you** ask **us** to delete it.

## DUTY TO REPORT CHANGES

**You** must promptly report to **us** all changes, including additions and deletions, in policy information. This includes, but is not limited to, changes in:

1. **your** mailing address or **your** residence address;
2. the principal garaging address of any **covered auto**;
3. the residents in **your** household;
4. the persons of legal driving age residing in **your** household;
5. the persons who regularly operate a **covered auto**;
6. an operator's marital or domestic partnership status; or
7. the driver's license or operator's permit status of **you**, a **relative**, or a **rated resident.**

## SETTLEMENT OF CLAIMS

**We** may use estimating, appraisal, or injury evaluation systems to assist **us** in adjusting claims under this policy and to assist **us** in determining the amount of damages,

24

expenses, or loss payable under this policy. Such systems may be developed by **us** or a third party and may include computer software, databases, and specialized technology.

## TERMS OF POLICY CONFORMED TO STATUTES

If any provision of this policy fails to conform to the statutes of the state listed on **your** application as **your** residence, the provision shall be deemed amended to conform to such statutes. All other provisions shall be given full force and effect. Any disputes as to the coverages provided or the provisions of this policy shall be governed by the law of the state listed on **your** application as **your** residence.

## TRANSFER OF INTEREST

The rights and duties under this policy may not be transferred to another person without **our** written consent. However, if a named insured shown on the **declarations page** dies, this policy will provide coverage until the end of the policy period for the legal representative of the named insured, while acting as such, and for persons covered under this policy on the date of the named insured's death.

## FRAUD OR MISREPRESENTATION

This policy was issued in reliance upon the information provided on **your** insurance application. **We** may void this policy at any time, including after the occurrence of an accident or loss, if **you**:
1. made incorrect statements or representations to **us** with regard to any material fact or circumstance;
2. concealed or misrepresented any material fact or circumstance; or
3. engaged in fraudulent conduct;

at the time of application. This means that **we** will not be liable for any claims or damages that would otherwise be covered. However, if **we** void this policy, this shall not affect coverage under Part I—Liability To Others up to the minimum liability insurance limits required by the financial responsibility law of the state shown on **your** application as **your** residence if the accident occurs before **we** notify the named insured that the policy is void. No payment will be made to any person who engages in fraudulent conduct. If **we** void this policy, **you** must reimburse **us** if **we** make a payment.

Any changes **we** make at **your** request to this policy after inception will be made in reliance upon information **you** provide. If **you**:
1. make incorrect statements or representations to **us** with regard to any material fact or circumstance;
2. conceal or misrepresent any material fact or circumstance; or
3. engage in fraudulent conduct;

in connection with a requested change **we** may void the policy or reform it as it existed immediately prior to the requested change. **W**e may do this at any time, including after the occurrence of an accident or loss.

25

When **we** have not voided or reformed the policy, **we** may still deny coverage for an accident or loss if **you**, in connection with the policy application, in connection with any requested change, or at any time during the policy period, have concealed or misrepresented any material fact or circumstance or engaged in fraudulent conduct and that concealment, misrepresentation, or fraudulent conduct was material to a risk **we** assumed.

**We** may deny coverage for an accident or loss if **you** or a person seeking coverage has concealed or misrepresented any material fact or circumstance, or engaged in fraudulent conduct, in connection with the presentation or settlement of a claim.

### PAYMENT OF PREMIUM AND FEES

If **your** initial premium payment is by check, draft, electronic funds transfer, or similar form of remittance, coverage under this policy is conditioned on payment to **us** by the financial institution. If the financial institution upon presentment does not honor the check, draft, electronic funds transfer, or similar form of remittance, this policy may, at **our** option, be deemed void from its inception. This means **we** will not be liable under this policy for any claims or damages that would otherwise be covered if the check, draft, electronic funds transfer, or similar form of remittance had been honored by the financial institution. Any action by **us** to present the remittance for payment more than once shall not affect **our** right to void this policy.

In addition to premium, fees may be charged on **your** policy. **We** may charge fees for installment payments, late payments, and other transactions. Payments made on **your** policy will be applied first to fees, then to premium due.

### CANCELLATION

**You** may cancel this policy during the policy period by calling or writing **us** and stating the future date **you** wish the cancellation to be effective.

**We** may cancel this policy during the policy period by mailing a notice of cancellation to the named insured shown on the **declarations page** at the last known address appearing in **our** records.

**We** will give at least 10 days notice of cancellation if:
1. **we** cancel during the first 69 days of the initial policy period; or
2. the policy is cancelled for nonpayment of premium.

**We** will give at least 30 days notice of cancellation in all other cases.

**We** may cancel this policy for any reason if the notice is mailed within the first 69 days of the initial policy period.

After this policy is in effect for at least 70 days, or if this is a renewal or continuation policy, **we** may cancel only for one or more of the following reasons:
1. nonpayment of premium;

26

2. material misrepresentation or fraud by **you** with respect to any material fact in the procurement, continuation, change or renewal of this policy;

3. material misrepresentation or fraud in the submission of a claim under this policy;

4. **your** place of residence or the state of registration or license of a **covered auto** is changed to a state or country in which **we** do not accept applications for the insurance provided by this policy;

5. the named insured shown on the **declarations page** is convicted of a crime arising out of acts increasing the hazard insured against;

6. **we** discover an act or omission, or a violation of a condition of the policy, that occurred during the policy period that substantially and materially increased the hazard insured against by **us**;

7. a material change in the nature or extent of the risk that occurred during the policy period that causes the risk of loss to be substantially and materially increased beyond that contemplated at the time the policy was issued or last renewed; or

8. a determination by the Commissioner of Insurance that continuation of the policy would violate one or more provisions of the Nevada Insurance Code, would jeopardize **our** solvency, or would be hazardous to the interests of policyholders, creditors, or the public.

Proof of mailing will be sufficient proof of notice. If this policy is cancelled, coverage will not be provided as of the effective date and time shown in the notice of cancellation. For purposes of cancellation, this policy is neither severable nor divisible. Any cancellation will be effective for all coverages for all persons and all vehicles.

**CANCELLATION REFUND**

Upon cancellation, **you** may be entitled to a premium refund. However, **our** making or offering of a refund is not a condition of cancellation.

If **you** request cancellation of this policy during the initial policy period, or if the policy is cancelled for nonpayment of premium during the initial policy period, any refund due will be computed on a 90 percent of a daily pro rata basis. This is a daily, accelerated method of calculating short-rate earned premium on cancellations. Earned premium is calculated on a daily basis. **We** will supply a copy of the table to **you** on request.

If **we** cancel this policy during the initial policy period for any reason other than nonpayment of premium, or if this policy is cancelled by either **you** or **us** during any renewal period, any refund due will be computed on a daily pro rata basis.

**NONRENEWAL**

If neither **we** nor one of **our** affiliates offers to renew or continue this policy, **we** will mail notice of nonrenewal to the named insured shown on the **declarations page** at the last known address appearing in **our** records. Proof of mailing will be sufficient proof of notice. Notice will be mailed at least 30 days before the end of the policy period. However, **we** have no duty to provide notice of nonrenewal if **you** have obtained other insurance for the **covered auto**.

27

**AUTOMATIC TERMINATION**

If **we** or an affiliate offers to renew or continue this policy and **you** or **your** representative does not accept, this policy will automatically terminate at the end of the current policy period. Failure to pay the required renewal or continuation premium when due will mean that **you** have not accepted **our** offer.

If **you** obtain other insurance on a **covered auto**, any similar insurance provided by this policy will terminate as to that **covered auto** on the effective date of the other insurance.

If a **covered auto** is sold or transferred to someone other than **you** or a **relative**, any insurance provided by this policy will terminate as to that **covered auto** on the effective date of the sale or transfer.

**LEGAL ACTION AGAINST US**

**We** may not be sued unless there is full compliance with all the terms of this policy.

**We** may not be sued for payment under Part I—Liability To Others until the obligation of an insured person under Part I to pay is finally determined either by judgment after trial against that person or by written agreement of the insured person, the claimant, and **us**. No one will have any right to make **us** a party to a lawsuit to determine the liability of an insured person.

If **we** retain salvage, **we** have no duty to preserve or otherwise retain the salvage for any purpose, including evidence for any civil or criminal proceeding.

**OUR RIGHTS TO RECOVER PAYMENT**

**We** are entitled to the rights of recovery that the insured person to whom payment was made has against another, to the extent of **our** payment. That insured person may be required to sign documents related to the recovery and must do whatever else **we** require to help **us** exercise those recovery rights, and do nothing after an accident or loss to prejudice those rights. However, **we** may not exercise such rights of recovery for any payment made under:
1.  Part II—Medical Payments Coverage; or
2.  Part III—Uninsured/Underinsured Motorist Coverage for an accident involving an **underinsured motor vehicle**.

In the event of any payment under Part III—Uninsured/Underinsured Motorist Coverage for an accident involving an **uninsured motor vehicle**, **we** are entitled to the proceeds of any settlement or recovery from any person legally responsible for the **bodily injury** for which payment was made, and, if applicable, to amounts recoverable from the assets of an insolvent insurer of the other motor vehicle.

28

When an insured person has been paid by **us** and also recovers from another, the amount recovered will be held by the insured person in trust for **us** and reimbursed to **us** to the extent of **our** payment. **We** are entitled to reimbursement as provided in this section regardless of whether the total amount of the recovery of the insured person on account of the injury is less than the actual loss suffered by the insured person. If **we** are not reimbursed, **we** may pursue recovery of that amount directly against that insured person.

If an insured person recovers from another without **our** written consent, the insured person's right to payment under any affected coverage will no longer exist.

If **we** elect to exercise **our** rights of recovery against another, **we** will also attempt to recover any deductible incurred by an insured person under this policy unless **we** are specifically instructed by that person not to pursue the deductible. **We** have no obligation to pursue recovery against another for any loss not covered by this policy.

**We** reserve the right to compromise or settle the deductible and property damage claims against the responsible parties for less than the full amount. **We** also reserve the right to incur reasonable expenses and attorney fees in pursuit of the recovery.

If the total recovery is less than the total of **our** payment and the deductible, **we** will reduce reimbursement of the deductible based on the proportion that the actual recovery bears to the total of **our** payment and the deductible. A proportionate share of collection expenses and attorney fees incurred in connection with these recovery efforts will also reduce reimbursement of the deductible.

These provisions will be applied in accordance with state law.

### JOINT AND INDIVIDUAL INTERESTS

If there is more than one named insured on this policy, any named insured may cancel or change this policy. The action of one named insured will be binding on all persons provided coverage under this policy.

### BANKRUPTCY

The bankruptcy or insolvency of an insured person will not relieve **us** of any obligations under this policy.

29

x



9611D NV 0116



# EXHIBIT B

# Market Survey Report



mitchell

Prepared For  Progressive Group of Insurance Companies   (800) 321-9843

## Claim Information

| Claim Number | Policy Number | Loss Type | Owner |
|---|---|---|---|
| 21-7231068-01 | | COLLISION | GARY YAGHYAZARIAN  |

| Loss Date | Reported Date | Valuation Report Date | Valuation Report ID | Version Number |
|---|---|---|---|---|
| 10/17/2021 | 10/17/2021 | 12/21/2021 | 1014113806 | 3 |

## Vehicle Information

| Year | Make | Model | Location | Mileage |
|---|---|---|---|---|
| 2019 | Genesis | G80 Ultimate 4 Door Sedan 5.0L 8 Cyl Gas A RWD | NV | 95,737 miles |

| Ext Color | License | VIN | Title History |
|---|---|---|---|
| Santiago Silver | | | No |

## Valuation Summary

### Loss Vehicle Adjustments
Adjustments specific to your vehicle

| | |
|---|---:|
| Base Value = | $37,356.89 |
| Condition - | $1,986.50 |
| Prior Damage | $0.00 |
| Aftermarket Parts | $0.00 |
| Refurbishment | $0.00 |
| Market Value = | $35,370.39 |

### Settlement Adjustments
Adjustments specific to your policy

| | |
|---|---:|
| Deductible - | $2,000.00 |
| Settlement Value = | $33,370.39 |

## Settlement Value:
# $33,370.39

Mitchell WorkCenter
Total Loss
© 2018 Mitchell International, Inc. All Rights Reserved.

# Loss Vehicle Detail

Loss vehicle: 2019 Genesis G80 | Ultimate 4 Door Sedan | 5.0L 8 Cyl Gas A RWD

## Standard Equipment

### Exterior

| | |
|---|---|
| Aluminum Spare Wheel | Body-Colored Front Bumper w/Chrome Bumper Insert |
| Body-Colored Power w/Tilt Down Heated Auto Dimming Side Mirrors w/Power Folding and Turn Signal Indicator | Body-Colored Rear Bumper |
| Chrome bodyside insert | Chrome door handles |
| Chrome grille | Chrome Side Windows Trim and Black Front Windshield Trim |
| Clearcoat paint | Compact Spare Tire Mounted Inside Under Cargo |
| Express Open/Close Sliding And Tilting Glass 1st And 2nd Row Sunroof w/Power Sunshade | Fixed Rear Window w/Defroster and Power Blind |
| Front fog lamps | Front Windshield -inc: Sun Visor Strip |
| Fully Automatic Projector Beam Led Low/High Beam Daytime Running Auto-Leveling Directionally Adaptive Auto High-Beam Headlamps w/Delay-Off | Fully Galvanized Steel Panels |
| Laminated Glass | LED brakelights |
| Light tinted glass | Perimeter/Approach Lights |
| Power Open And Close Trunk Rear Cargo Access | Speed Sensitive Rain Detecting Variable Intermittent Wipers |
| Tires: P245/40R19 Front & P275/35R19 Rear AS | Wheels w/Silver Accents |
| Wheels: 19" x 8.5J Fr & 19" x 9.0J Rr Alloy | |

### Interior

| | |
|---|---|
| 12-Way Driver Seat | 2 12V DC Power Outlets |
| 2 LCD Monitors In The Front | 2 Seatback Storage Pockets |
| 8-Way Passenger Seat | Air filtration |
| Analog Display | Automatic Equalizer |
| Bench Front Facing Heated Rear Seat | Cargo net |
| Cargo Space Lights | Carpet Floor Trim and Carpet Trunk Lid/Rear Cargo Door Trim |
| Compass | Cruise control w/steering wheel controls |
| Day-Night Auto-Dimming Rearview Mirror | Delayed Accessory Power |
| Distance Pacing w/Traffic Stop-Go | Driver / Passenger And Rear Door Bins |
| Driver And Passenger Visor Vanity Mirrors w/Driver And Passenger Illumination, Driver And Passenger Auxiliary Mirror | Driver foot rest |
| Dual Zone Front Automatic Air Conditioning | Engine Immobilizer |
| Fade-to-off interior lighting | FOB Controls -inc: Trunk/Hatch/Tailgate and Remote Engine Start |
| Front And Rear Map Lights | Front Center Armrest and Rear Center Armrest w/Pass-Thru |
| Front Cupholder | Full Carpet Floor Covering -inc: Carpet Front And Rear Floor Mats |
| Full Floor Console w/Covered Storage, Mini Overhead Console w/Storage and 2 12V DC Power Outlets | Full Simulated Suede Headliner |
| Gauges -inc: Speedometer, Odometer, Engine Coolant Temp, Tachometer, Trip Odometer and Trip Computer | Genesis Connected Services Tracker System |

Head-up display

Heated & Ventilated Front Bucket Seats -inc: contrast stitching, 16-way power driver seat w/power side bolster, cushion extension, 4-way lumbar and integrated memory system and 12-way power passenger seat w/4-way power lumbar

Heated Leather Steering Wheel w/Auto Tilt-Away

HomeLink Garage Door Transmitter

HVAC -inc: Underseat Ducts and Console Ducts

Illuminated locking glove box

Interior Trim -inc: Aluminum/Genuine Wood Instrument Panel Insert, Genuine Wood/Metal -Look Door Panel Insert, Aluminum Console Insert and Metal-Look Interior Accents

Leather/Metal-Look Gear Shift Knob

Leatherette Door Trim Insert

Manual Anti-Whiplash w/Tilt Front Head Restraints and Manual Adjustable Rear Head Restraints

Memory Settings -inc: Door Mirrors and Steering Wheel

Nappa leather seating surfaces

Outside temp gauge

Perimeter alarm

Power 1st Row Windows w/Front And Rear 1-Touch Up/Down

Power Door Locks w/Autolock Feature

Power Rear Windows and w/Manual Sun Blinds

Power Tilt/Telescoping Steering Column

Proximity Key For Doors And Push Button Start

Radio w/Seek-Scan, Clock, Steering Wheel Controls, Radio Data System, DVD-Audio and Internal Memory

Radio: AM/FM/HD/SiriusXM/CD/DVD/MP3 Audio System -inc: Lexicon Quantum Logic surround sound system w/17 high efficiency speakers (1 front coaxial dash-mounted midrange, 1 front dash-mounted tweeter, 2 front dash-mounted midrange, 2 front door-mounted tweeters, 2 front door-mounted woofers, 2 rear door-mounted tweeters, 2 rear door-mounted midrange, 2 rear door-mounted woofers, 2 rear deck midrange and rear deck subwoofer), Clari-Fi Music Restoration Technology, Lexicon 12-channel digital external amplifier: 75W x 12 channels (900W max, equivalent output), speed-sensing auto volume control, AVN 2.0 navigation system, 9.2" touchscreen 720P HD display, driver information system, SiriusXM Traffic, Android Auto, Apple CarPlay, 1 USB data/charge plus 1 USB charge only, Bluetooth hands-free phone system w/audio streaming and Genesis Connected Services

Rear cupholder

Redundant Digital Speedometer

Remote Keyless Entry w/Integrated Key Transmitter, 4 Door Curb/Courtesy, Illuminated Entry, Illuminated Ignition Switch and Panic Button

Remote Releases -Inc: Proximity Cargo Access and Power Fuel

Seats w/Leatherette Back Material

Systems Monitor

Trip computer

Trunk/Hatch Auto-Latch

Turn-By-Turn Navigation Directions

Valet Function

Window Grid Antenna

## Mechanical

105-Amp/Hr Maintenance-Free Battery w/Run Down Protection

180 amp alternator

20.3 Gal. Fuel Tank

3.54 axle ratio

4-Wheel Disc Brakes w/4-Wheel ABS, Front Vented Discs, Brake Assist, Hill Hold Control and Electric Parking Brake

Dual Stainless Steel Exhaust w/Chrome Tailpipe Finisher

Electric Power-Assist Speed-Sensing Steering

Front And Rear Anti-Roll Bars

Gas-pressurized shock absorbers

Multi-Link Front Suspension w/Coil Springs

Multi-link rear suspension w/coil springs

Rear-wheel drive

Sport tuned suspension

Transmission w/Driver Selectable Mode

## Safety

ABS And Driveline Traction Control

Airbag Occupancy Sensor

Blind Spot Collision Warning Blind Spot Sensor

Curtain 1st And 2nd Row Airbags

Driver Knee Airbag and Rear Side-Impact Airbag

Dual Stage Driver And Passenger Front Airbags

Dual Stage Driver And Passenger Seat-Mounted Side Airbags

Electronic stability control (ESC)

Forward Collision-Avoidance Assist and Rear Cross-Traffic Collision Warning

Front Camera

Lane Keep Assist (LKA) Lane Departure Warning

Lane Keep Assist (LKA) Lane Keeping Assist

Left Side Camera

Outboard Front Lap And Shoulder Safety Belts -inc: Rear Center 3 Point, Height Adjusters and Pretensioners



| | |
|---|---|
| Parking Distance Warning Front And Rear Parking Sensors | Rear child safety locks |
| Restricted Driving Mode | Right Side Camera |
| Side impact beams | Surround View Monitor Back-Up Camera |
| Tire Specific Low Tire Pressure Warning | |

## Optional Equipment

MUD GUARDS                                            REVERSIBLE CARGO TRAY

**\*DIO/PIO =**   Dealer/Port Installed Options

# Loss Vehicle Base Value

Loss vehicle:  2019 Genesis G80 |  Ultimate 4 Door Sedan | 5.0L 8 Cyl Gas A RWD

## Comparable Vehicle Information

    Search Radius used for this valuation: 75 miles from loss vehicle zip/postal code.
        Typical Mileage for this vehicle: 23,000 miles

| # | Vehicle Description | Mileage | Location | Distance From Loss Vehicle | Price | Adjusted Value |
|---|---|---|---|---|---|---|
| 1 | 2019 GENESIS G80 ULTIMATE 4D SDN 8 5NORMAL GAS A 2WD | 12,163 | 85281 | 257 miles | $48,999.00 List Price | $37,358.15 |
| 2 | 2019 GENESIS G80 ULTIMATE 4D SDN 8 5NORMAL GAS A 2WD | 22,000 | 73069 | 995 miles | $46,588.00 List Price | $37,355.63 |
| | | | | | **Base Value:** | **$37,356.89** |

# Loss Vehicle Adjustments

Loss vehicle:  2019 Genesis G80 | Ultimate 4 Door Sedan | 5.0L 8 Cyl Gas A RWD



## Condition Adjustments

Condition Adjustment:  -$1,986.50          Overall Condition:  2.46-Fair          Typical Vehicle Condition:  3.00

| Category | Condition | Condition $ | Comments |
|---|---|---|---|
| **Interior** | | | |
| DASH/CONSOLE | 3 Good | $0.00 | |
| GLASS | 3 Good | $0.00 | |
| CARPET | 3 Good | $0.00 | |
| HEADLINER | 3 Good | $0.00 | |
| DOORS/INTERIOR PANELS | 3 Good | $0.00 | |
| SEATS | 3 Good | $0.00 | |
| **Exterior** | | | |
| BODY | 1 Poor | -$1,558.04 | POOR QUALITY REPAIRS/SURFACE RUST |
| PAINT | 2 Fair | -$324.59 | COLOR MISMATCH |
| VINYL/CONVERTIBLE TOP | Typical | $0.00 | |
| TRIM | 2 Fair | -$103.87 | MULTIPLE MINOR IMPACTS, PEELING |
| **Mechanical** | | | |
| ENGINE | 3 Good | $0.00 | |
| TRANSMISSION | 3 Good | $0.00 | |
| Tire | 3 Good | $0.00 | 6/32 7/32 4/32 3/32 |

Typical Vehicle Condition reflects a condition similar to the same year, make and model. Amount of wear and tear/ damage consistent with its age.

Comments:

# Comparable Vehicles

Loss vehicle:  2019 Genesis G80 | Ultimate 4 Door Sedan | 5.0L 8 Cyl Gas A RWD

| 1 | **2019 GENESIS G80 ULTIMATE 4D SDN 8 5 NORMAL GAS A2WD** | | | **List Price: $48,999.00** |

| VIN | Stock No | Listing Date | ZIP/Postal Code | Distance from Loss Vehicle |
|---|---|---|---|---|
| ✕✕✕✕✕✕✕✕✕✕ | AH310044 | 10/26/2021 | 85281 | 257 miles |

Source

DEALER WEB LISTING -
BUILDSHEET - CARS.COM
AUTO HOUSE TEMPE
360 S. SMITH ROAD
TEMPE AZ 85281
602-405-8406

| Adjustments | Loss Vehicle | This Vehicle | Amount |
|---|---|---|---|
| Projected Sold Adjustment | | | -$835.00 |
| Mileage | 95,737 | 12,163 | -$10,987.52 |
| Equipment | | | |
| MUD GUARDS | Yes | No | $97.19 |
| REVERSIBLE CARGO TRAY | Yes | No | $84.48 |
| | | Total Adjustments: | -$11,640.85 |
| | | **Adjusted Price:** | **$37,358.15** |

| 2 | **2019 GENESIS G80 ULTIMATE 4D SDN 8 5 NORMAL GAS A2WD** | | | **List Price: $46,588.00** |

| VIN | Stock No | Listing Date | ZIP/Postal Code | Distance from Loss Vehicle |
|---|---|---|---|---|
| ✕✕✕✕✕✕✕✕✕✕ | GN1311A | 11/05/2021 | 73069 | 995 miles |

Source

DEALER WEB LISTING -
BUILDSHEET - CARS.COM
AUTOMAX HYUNDAI NORMAN
551 N INTERSTATE DR
NORMAN OK 73069
405-364-2000

| Adjustments | Loss Vehicle | This Vehicle | Amount |
|---|---|---|---|
| Projected Sold Adjustment | | | -$794.00 |
| Mileage | 95,737 | 22,000 | -$8,438.41 |
| Equipment | | | |
| MUD GUARDS | Yes | No | $92.41 |
| REAR BUMPER APPLIQUE | No | Yes | -$56.24 |
| FIRST AID KIT | No | Yes | -$36.13 |
| | | Total Adjustments: | -$9,232.37 |
| | | **Adjusted Price:** | **$37,355.63** |

Comparable Vehicle Option Details:

REVERSIBLE CARGO TRAY, REAR BUMPER APPLIQUE, FIRST AID KIT

# Sub-Model Comparison

| Sub-Model Description | Configuration | Original MSRP |
|---|---|---|
| 2019 Genesis G80 Ultimate | 4 Door Sedan 5.0L 8 Cyl Gas  RWD | $57,000.00 |


Mitchell WorkCenter
Total Loss

# Vehicle Valuation Methodology Explanation

WorkCenter Total Loss was designed and built in conjunction with J.D. Powers, experts in data analysis and vehicle pricing and a highly trusted name among consumers. With years of experience in vehicle pricing, J.D Power is a credible, third-party expert whose name provides consumer recognition and confidence. WCTL provides a consistent methodology across all vehicles and it includes valid comparable vehicles that most closely resemble the totaled vehicle and are similar to the vehicles a consumer would find in their own research.

WorkCenter Total Loss produces accurate and easy-to-understand vehicle valuations via this five step process:

**Step 1 - Locate Comparable Vehicles**

Locate vehicles that are the closest match to the loss vehicle in the same market area. WorkCenter Total Loss utilizes consumer-based vehicle sources along with inventory directly from Dealerships. When available WCTL also provides sold vehicle records from sources such as J.D. Powers.

**Step 2 - Adjust Comparable Vehicles**

Make adjustments to the prices of the comparable vehicles. The comparable vehicles are identical to the loss vehicle except where adjustments are itemized. There are several types of comparable vehicle adjustments

- Projected Sold Adjustment - an adjustment to reflect consumer purchasing behavior (negotiating a different price than the listed price).

- Mileage Adjustment - an adjustment for differences in mileage between the comparable vehicle and the loss vehicle.

- Equipment- adjustments for differences in equipment between the comparable vehicle (e.g. equipment packages and options) and the loss vehicle.

**Step 3 - Calculate Base Vehicle Value**

The base vehicle value is calculated by averaging the adjusted prices of the comparable vehicles.

**Step 4 - Calculate Loss Vehicle Adjustments**

There are four types of loss vehicle adjustments:

- Condition Adjustment:

  Adjustments to account for the condition of the loss vehicle prior to the loss.

- Prior Damage Adjustment:

  Adjustments to account for any prior damage present on the loss vehicle prior to the loss.

- After Market Part Adjustment:

  Adjustments to account for any after market parts present on the loss vehicle prior to the loss.

- Refurbishment Adjustment:

  Adjustments to account for any refurbishment performed on the loss vehicle prior to the loss.

**Step 5 - Calculate the Market Value**

The Market Value is calculated by applying the loss vehicle adjustments to the base value.

